# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE ENERGY TRANSFER EQUITY, )
L.P. UNITHOLDER LITIGATION ) C.A. No. 12197-VCG

## MEMORANDUM OPINION

Date Submitted: April 16, 2018
Date Decided: May 17, 2018

Michael Hanrahan, Paul A. Fioravanti, Jr., Kevin H. Davenport, Samuel L. Closic, and Eric J. Juray, of PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; OF COUNSEL: Marc A. Topaz, Lee D. Rudy, Eric L. Zagar, Michael C. Wagner, and Grant D. Goodhart, III, of KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania, *Attorneys for Plaintiffs*.

Rolin P. Bissell, James M. Yoch, Jr., and Benjamin M. Potts, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL: Michael C. Holmes, John C. Wander, Craig E. Zieminski, and Andrew E. Jackson, of VINSON & ELKINS LLP, Dallas, Texas, *Attorneys for Defendants Energy Transfer Equity, L.P., LE GP, LLC, Kelcy L. Warren, John W. McReynolds, Marshall S. McCrea III, Matthew S. Ramsey, Ted Collins, Jr., K. Rick Turner, Ray Davis, and Richard D. Brannon.*

David E. Ross and Benjamin Z. Grossberg, of ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; OF COUNSEL: M. Scott Barnard, Michelle Reed, and Lauren E. York, of AKIN GUMP STRAUSS HAUER & FELD LLP, Dallas, Texas, *Attorneys for Defendant William P. Williams*.

GLASSCOCK, Vice Chancellor

Now-Chief Justice Strine once colorfully described the results of precipitous or imprudent action thus: it is easier to throw pizza at a wall than to clean it up.[1] The pie of the ill-fated merger of ETE and Williams hit the wall of the downturn in the energy industry in early summer of 2016. The cleanup has, from a legal point of view, been arduous, and is ongoing. This matter involves but one slice of that pie.

Certain ETE unitholders, purportedly on behalf of a class, challenge the issuance of securities by ETE in a private offering going largely, but not exclusively, to insiders. ETE made the issuance in contemplation of the merger with Williams. According to the Defendants, ETE was, as a result of the cash required to consummate the merger in light of the economic downturn, between the Scylla of a downgraded credit rating—devastating for an MLP like ETE—and the Charybdis of halting cash distributions to unitholders—a proposition also disastrous to an MLP. In the Defendants' telling, the private offering was a device to assuage concerns of the credit rating agencies without cutting distributions; to the Plaintiffs, it was a hedge meant to protect insiders from the anticipated bad effects of the coming merger. I find it was both.

The private offering is described in detail in this Memorandum Opinion, but in abbreviated form subscribers agreed to accumulate credit redeemable as common

---

[1] *Auriga Capital Corp. v. Gatz Props.*, 40 A.3d 839, 882 n.184 (Del. Ch. 2012), *aff'd sub nom. Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206 (Del. 2012). Clearly, the Chief Justice does not own dogs like mine, who would make short work of such cleanup sans complaint.

units in ETE after nine quarters, in return for forgoing some distributions over that period, and were guaranteed to accrue some quantum of such credit even if distributions were reduced or cancelled. The benefit to ETE was that the forgone distributions would allow the company to avoid some borrowing, lowering the debt-to-earnings ratio, the metric that most concerned the rating agencies. The private offering was not contingent on the merger closing.

In the event, ETE was able to avoid the merger. The energy market has boomed, and the value of ETE units has soared. The Plaintiffs brought this action, alleging that the private offering is prohibited under the terms of the LPA, and that the contemplated redemption would result in a windfall for subscribers at the expense of the Partnership and its non-subscribing unitholders. ETE strenuously disagrees. The matter was tried over three days, and post-trial briefing and argument ensued. The Plaintiffs seek cancellation of the private offering. The nine-quarter life of the offering ends on May 18, 2018, at which point the accumulated credit will be redeemed for common ETE units; therefore, equitable relief, according to the Plaintiffs, to be meaningful must issue before that time. Accordingly, my consideration of the matter has been abbreviated; this rough-and-ready Memorandum Opinion is the result.

Upon consideration of the evidence, I find that the private offering does not represent an impermissible distribution prohibited by the LPA. The offering is a

3

conflicted transaction, however, which under that contract must be fair and reasonable to the Partnership. The Defendants failed to effectively take advantage of safe harbor provisions that would have demonstrated, conclusively, compliance with the "fair and reasonable" standard. The issue, then, is one of fact, with the burden on the Defendants to demonstrate the fairness of the transaction. I find that the Defendants have failed to demonstrate that the private offering was fair to the Partnership. Thus, in issuing the securities, the General Partner breached the LPA.

The Plaintiffs have represented that damages are unavailable. They seek equitable relief, the cancellation of the securities. I find that they have failed to establish that equity should so act here, however.

My reasoning follows.

## I. BACKGROUND

Trial took place over three days, during which ten witnesses gave live testimony. The parties submitted over 900 exhibits, and sixteen depositions were lodged. I give the evidence the weight and credibility I find that it deserves.

*A. The Parties*

Defendant Energy Transfer Equity, L.P. ("ETE") is a Delaware master limited partnership ("MLP") headquartered in Dallas, Texas.[2] ETE's family of companies

---

[2] PTO ¶ 16.

owns over 71,000 miles of oil and gas pipelines.[3] ETE's common units trade on the New York Stock Exchange under the symbol "ETE."[4]

Defendant LE GP, LLC is a Delaware limited liability company.[5] LE GP, LLC (the "General Partner") directs all of ETE's activities, and ETE is managed by the General Partner's board of directors (the "Board").[6] In accordance with this role, the Board appoints ETE's executive officers.[7]

Defendant Kelcy L. Warren has served as the Chairman of the Board since August 15, 2007, and as of February 12, 2016, he held 187,739,220 ETE common units, representing about 18% of ETE's outstanding common units.[8] Since August 15, 2007, Warren has also served as the CEO and Chairman of the board of Energy Transfer Partners, GP, L.P. ("ETP GP").[9] ETP GP is the general partner of Energy Transfer Partners, L.P. ("ETP"), a member of the ETE family of companies.[10]

Defendant John W. McReynolds has served as ETE's President since March 2005, and he has been a General Partner director since August 2005.[11] As of February 12, 2016, McReynolds owned 25,084,555 ETE common units.[12]

---

[3] *Id.*
[4] *Id.*
[5] *Id.* ¶ 22.
[6] *Id.* ¶¶ 18–19.
[7] *Id.* ¶ 25.
[8] *Id.* ¶¶ 29, 33.
[9] *Id.* ¶ 35.
[10] *Id.* ¶¶ 26, 84.
[11] *Id.* ¶ 38.
[12] *Id.* ¶ 37.

Defendant Ted Collins, Jr. served on the Board from November 2015 to October 31, 2016, and he served as an ETP GP director from August 2014 until he passed away on January 28, 2018.[13] As of February 12, 2016, Collins held 351,639 ETE common units.[14]

Defendant K. Rick Turner has served on the Board since October 2002, and he has also served as a director of Sunoco L.P., a member of the ETE family of companies.[15] As of February 12, 2016, Turner owned 362,095 ETE common units.[16]

Defendant William P. Williams began working in the oil and gas industry in 1967, and he served as ETP's Vice President of Engineering and Operations and Vice President of Measurement before his retirement in 2011.[17] Williams was appointed to the Board in March 2012.[18] As of February 12, 2016, Williams owned 5,399,835 ETE common units.[19]

Defendant Marshall S. McCrea III began serving as a General Partner director in December 2009, and he has been an ETP GP director since 2009.[20] Since November 2015, McCrea has served as the ETE family's Group Chief Operating

---

[13] *Id.* ¶¶ 42–44. The parties have agreed to dismiss Collins from this action with prejudice.
[14] *Id.* ¶ 40.
[15] *Id.* ¶¶ 26, 47.
[16] *Id.* ¶ 45.
[17] *Id.* ¶ 50; Trial Tr. 188:21–22.
[18] PTO ¶ 51.
[19] *Id.* ¶ 48.
[20] *Id.* ¶ 53.

Officer and Chief Commercial Officer.[21]  As of February 12, 2016, McCrea held 2,347,200 ETE common units.[22]

Defendant Matthew S. Ramsey has served on the Board since July 17, 2012.[23] Since November 2015, Ramsey has been the President and COO of ETP GP, on whose board he also serves.[24]  As of February 12, 2016, Ramsey held 52,317 ETE common units.[25]

Defendant Ray Davis held 67,216,204 ETE common units as of February 12, 2016.[26]  Effective August 15, 2007, Davis retired from his positions as co-CEO and co-Chairman of ETP, and co-Chairman of ETE.[27]  Davis resigned from the Board on February 13, 2013, and he resigned from the ETP board on June 30, 2011.[28]

Defendant Richard D. Brannon began serving on the Board on March 16, 2016.[29]  He was not on the Board when it approved the issuance challenged by the Plaintiffs in this action.[30]

---

[21] *Id.* ¶ 54.
[22] *Id.* ¶ 52.
[23] *Id.* ¶ 55.
[24] *Id.* ¶¶ 56–57.
[25] *Id.* ¶ 55.
[26] *Id.* ¶ 58.
[27] *Id.* ¶ 59.
[28] *Id.* ¶¶ 60–61.
[29] *Id.* ¶ 64.
[30] *Id.*

Plaintiff Lee Levine is a New Jersey lawyer who has held ETE common units at all relevant times.[31] Plaintiff Chester County Employees' Retirement Fund has likewise held ETE common units at all relevant times.[32]

### B. Factual Background

#### 1. ETE Agrees to Merge with Williams, and Industry Conditions Decline

On September 28, 2015, ETE and several of its affiliates entered into an agreement to merge with the Williams Companies, Inc. ("Williams Co."),[33] an energy infrastructure company.[34] Under the merger agreement, Williams Co. would receive, among other things, $6.05 billion in cash, which ETE would finance with new debt.[35] ETE would also assume approximately $4.2 billion of Williams Co.'s outstanding debt.[36] Moreover, ETE expected to become the parent of Williams Partners, L.P. ("WPZ"), which had $19.1 billion in outstanding debt.[37] As a result, ETE predicted that its consolidated debt would increase by over $30 billion if the merger closed.[38]

---

[31] *Id.* ¶¶ 11–12.
[32] *Id.* ¶ 14.
[33] I refer to The Williams Companies as "Williams Co." to differentiate references to William P. Williams, member of the Board, who I denominate as "Mr. Williams" or "Williams."
[34] *Id.* ¶¶ 80, 87. Interested readers may find a more complete description of the merger in *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 2016 WL 3576682 (Del. Ch. June 24, 2016), *aff'd*, 159 A.3d 264 (Del. 2017).
[35] JX 405.0078.
[36] *Id.*
[37] *Id.* at .0046.
[38] *Id.*

Soon after the merger was announced, the energy sector entered a precipitous decline.[39]  From September 2015 to the end of February 2016, the price of crude oil fell by 26.3%, and the price of natural gas dropped 39.1%.[40]  During this period, ETE's unit price fell by 65.5%.[41]  As a result of the downturn, the credit market for energy companies experienced significant stress.[42]  Access to credit was reduced, and energy companies were at increased risk of a credit rating downgrade from the major rating agencies (Moody's Investors Services, Standard & Poor's, and Fitch Group).[43]  Indeed, between December 2015 and March 2016, Moody's issued fifty-two credit rating downgrades in the energy sector alone.[44]  One group of analysts covering the MLP sector noted that "the rating agencies have raised the bar for what's acceptable in terms of debt/EBITDA levels."[45]

These developments spelled trouble for ETE.  As an MLP, ETE distributed all of its available cash to unitholders every quarter.[46]  Thus, ETE depended on access to capital markets to fund its growth.[47]  Because credit ratings determine access to credit and the cost of debt, it was particularly important for the ETE family

---

[39] Trial Tr. 460:13–17; JX 138.0003.
[40] JX 678.0020–21.
[41] *Id.* at .0021.
[42] *Id.* at .0022.
[43] *Id.* at .0010, .0022.
[44] *Id.* at .0022.
[45] JX 242.0002.
[46] JX 678.0009; Trial Tr. 229:3–17.
[47] JX 678.0010; Trial Tr. 60:12–14.

of companies to maintain its ratings.[48] But that was becoming increasingly difficult by late 2015, when the rating agencies began to express concern about ETE's credit outlook.[49] Notably, from September 2015 to February 2016, ETE's and Williams Co.'s EBITDA projections for 2016 to 2018 declined by between 14% and 22%, which increased ETE's forecasted debt-to-EBITDA ratio ("D/E").[50]

In January 2016, the rating agencies downgraded Williams Co. and WPZ and lowered ETE's credit outlook from "positive" to "stable."[51] Tom Long, ETE's CFO, described the latter step as "shooting a little missile across the bow," by which he meant that the rating agencies were signaling the importance of taking action to improve ETE's credit outlook.[52] The rating agencies focused in particular on ETE's D/E, which they expected to be kept at 4.0x or lower; Long told the agencies that if the ratio went above 4.0x, an equity issuance would be on the table.[53] For its part, Perella Weinberg Partners ("Perella"), ETE's financial advisor, predicted that ETE's D/E would reach 4.7x if the merger with Williams Co. closed.[54] ETE therefore needed to take swift action to assuage the rating agencies, because if it did nothing, it faced the prospect of a credit rating downgrade.[55] But deleveraging need not come

---

[48] JX 678.0010; Trial Tr. 60:15–24.
[49] Trial Tr. 227:24–229:24.
[50] JX 556.0018–19; JX 900.0004.
[51] JX 52; JX 56.0002; JX 63; Trial Tr. 233:17–20.
[52] Trial Tr. 233:3–20.
[53] *Id.* at 230:19–231:19; JX 49.0002; JX 53.0001.
[54] JX 175.0004.
[55] Trial Tr. 233:21–234:6, 409:1–4, 609:17–20; Beach Dep. 144:1–6.

"in one fell swoop;" instead, the rating agencies look for "an actionable plan to achiev[e] a longer term leveraging target."[56]

As the Plaintiffs' expert testified, a rating downgrade would have put ETE in "a very bad situation."[57] For one thing, ETE's and its subsidiaries' credit ratings are linked, so a downgrade at ETE could have led to downgrades at other companies in the ETE family.[58] And because ETE's subsidiaries were only one step above a high-yield rating, a downgrade at those subsidiaries would have had several negative consequences, including a substantial increase in the cost of debt and a reduction in access to capital markets.[59] Moreover, a downgrade at ETE would have made it much more costly to finance or refinance its debt.[60] To illustrate this, one of the Defendants' experts showed that a one-step downgrade would have increased ETE's interest expense by approximately $607 million between 2016 and 2018.[61] Finally, a downgrade would have harmed ETE's competitiveness and commercial reputation.[62]

---

[56] Trial Tr. 470:18–23.
[57] *Id.* at 63:6–7.
[58] *Id.* at 504:18–21; McCrea Dep. 48:6–13, 56:2–57:2.
[59] Trial Tr. 238:1–15, 504:18–505:14; *see also* JX 242.0005 ("For midstream companies with investment grade ratings, defending that rating remains of utmost importance.").
[60] JX 678.0033; Beach Dep. 256:16–21.
[61] Trial Tr. 606:7–8; JX 678.0034.
[62] McCrea Dep. 54:4–19.

## 2. ETE Explores Deleveraging Options

ETE began considering deleveraging options in early 2016.[63] ETE's first step was to decide to keep distributions flat at $0.285 per quarter for several quarters.[64] That was a departure from past practice: from the first quarter of 2014 to the third quarter of 2015, ETE's distributions had steadily increased.[65] ETE also retained Perella to, among other things, help it devise a plan to assuage the rating agencies.[66] Perella presented ETE with several options, including issuing equity, renegotiating the terms of the Williams Co. merger so that ETE would pay with equity rather than cash, selling assets, and cutting distributions.[67] Several of these options were infeasible in early 2016.[68] For example, given industry conditions at the time, asset sales were not an attractive option.[69] What is more, ETE tried (and failed) to persuade Williams Co. to accept equity rather than cash as merger consideration.[70] ETE was further stymied by the merger agreement, which contained several conduct-of-business restrictions that constrained its deleveraging options.[71]

---

[63] Trial Tr. 232:5–17.
[64] *Id.* at 246:5–15; JX 124.0003; JX 181.0006.
[65] PTO ¶ 21.
[66] Trial Tr. 448:6–8; JX 76.0001; JX 136.0004.
[67] JX 136.0006, .0014; JX 175.0005, .0007.
[68] *E.g.*, Beach Dep. 259:12–21; Trial Tr. 251:1–252:8.
[69] Trial Tr. 138:20–139:4.
[70] DX7, at 190:21–193:15.
[71] JX 35, § 4.01(b); Trial Tr. 251:6–8.

As just noted, Perella's analyses included distribution cuts as one means of reducing leverage.[72] For example, in its February 8, 2016 presentation to the General Partner and ETP boards, Perella explained that ETE had three "holistic" options for reducing its leverage: issuing equity, adjusting the merger consideration, and cutting distributions.[73] Perella noted that a partial or complete distribution cut following the merger would pose "[n]o execution risk," in addition to satisfying the rating agencies and not requiring Williams Co.'s approval.[74]

Perella was not the only entity that analyzed distribution cuts for ETE. In January 2016, Goldman, Sachs & Co. performed such an analysis.[75] Indeed, in mid-February, ETE President John McReynolds told Goldman that ETE was open to the possibility of a distribution cut.[76] And starting in early February 2016, ETE itself began analyzing scenarios in which distributions were cut, though neither ETE's management projections nor its presentations to the rating agencies included any cuts.[77]

Moreover, around this time, some market participants expressed the view that ETE would eventually cut distributions. For example, on January 15, 2016, Wells

---

[72] *E.g.*, JX 81.0002; JX 82.0005; JX 86.0005; JX 94.0006, .0008, .0010, .0022–23; JX 136.0009.
[73] JX 175.0005.
[74] *Id.*
[75] JX 75.0001–4; JX 93.0001, .0037–39.
[76] JX 191.
[77] JX 155.0002; JX 157.0002–03; JX 170.0001; JX 199.0001; JX 205.0001–02; JX 253.0003–04; Trial Tr. 271:15–272:8.

13

Fargo described ETE as a "[p]otential [c]andidate" for a distribution cut owing to its "[h]igh leverage [and] limited ability to access capital markets."[78]  And on February 10, financial services provider Raymond James sent the following email to a General Partner director: "The latest report of Feb 9, it seems like these are coming daily….obviously the ETE group is trading as if a distributions cut is coming….good luck."[79]  During a February 25 earnings call, Warren himself stated that while there were no "contemplated distribution cuts at ETP whatsoever," they were nevertheless an "option" and "certainly possible."[80]

Nevertheless, Perella and ETE aver they were not seriously considering a distribution cut at this time.[81]  Long explained at trial that, in the MLP sector, distribution cuts are "the option of last resort, kind of the nuclear option."[82]  Warren, for his part, testified that maintaining distributions was critical to ETE, and that cutting distributions would cause the market to "lose[] its trust" in the company, thereby "affect[ing] [its] equity price for [the] long term."[83]  And Andrew Bednar, a Perella partner who advised ETE on deleveraging options, noted that distribution cuts are "the last thing on the list."[84]  Bednar elaborated: "[I]n the MLP universe,

---

[78] JX 66.0008.
[79] JX 184.0001.
[80] JX 280.0013.
[81] Trial Tr. 253:1–10, 441:3–8, 456:14–22.
[82] *Id.* at 247:4–6.
[83] *Id.* at 391:24–392:13.
[84] *Id.* at 456:8.

14

distributions are viewed as sacrosanct, and they drive a lot of the valuation of the underlying unit. And so if you look at history, 'what's past is prologue,' you would have to expect a pretty severe reaction to any distribution cut."[85]  Bednar's take on distribution cuts finds some support in market evidence: between July 2015 and March 2016, MLPs that engaged in distribution cuts underperformed the S&P by 45.4% in the year after the cuts.[86]

### 3. ETE Decides on a Public Offering, Which Then Becomes a Private Offering

On February 8, 2016, the Board evaluated a term sheet for a public offering of securities with a guaranteed $0.11 of cash or accrual per quarter.[87]  The discussion included a presentation by Perella on various deleveraging options.[88]  Four days later, Long sent Don Chappel, Williams Co.'s CFO, a draft Form S-3 for the public offering that guaranteed only $0.11 in cash or accrual if common unit distributions were less than $0.11 (the "Initial Terms").[89]  If the common unit distributions were above $0.11, however, the participating unitholders would receive $0.11 in cash and an accrual, redeemable for common units, for the amount in excess of $0.11.[90]

---

[85] *Id.* at 456:24–457:5.
[86] JX 688.010.
[87] JX 175.0001, .0012–13.
[88] *Id.* at .0001–03.
[89] JX 200.0001, .0021.
[90] *Id.* at .0022; Trial Tr. 318:19–319:1.

15

On February 13, 2016, Chappel informed Long that Williams Co. believed the public offering required Williams Co.'s consent and that he (Chappel) would not allow Williams Co.'s auditors to release the financials necessary to file the S-3.[91] That was essential to the public offering, because to issue the securities, ETE was required to file an S-3 with the Securities and Exchange Commission.[92] The same day Long and Chappel had this conversation, attorneys representing Williams Co. and ETE exchanged emails about the disputed consent requirement.[93] The next day, Chappel sent Long an email stating that the consent "matter will not be resolved in the next several days," and ignoring a request from Long to designate a person to work on obtaining consents for the proposed S-3.[94] Within a few minutes, Thomas Mason, ETE's general counsel, and McReynolds, ETE's president, exchanged emails that included Chappel's response.[95]

On the morning of February 15, Latham & Watkins LLP, which represented ETE, sent an updated S-3 and LPA Amendment in regard to the proposed offering, with redlines, to ETE's leadership and its financial and legal advisors.[96] Those attachments are fully redacted.[97] Nevertheless, a comparison of redlines to

---

[91] JX 200.0001; JX 215.0002; Trial Tr. 315:12–316:11.
[92] 17 C.F.R. § 210.3–05.
[93] JX 206.0001–03.
[94] JX 209.0001.
[95] *Id.*
[96] JX 233.0001–02.
[97] *Id.* at .0003–10.

16

Amendment No. 5 from Latham's drafts of February 12 and February 25[98] reveals an increase in unit quarterly accrual from $0.11 to $0.285.[99] That is, the updated S-3, for the first time, contained a massive accrual increase, which would be a lucrative hedge for subscribers in the event of distribution cuts.

That afternoon, the Board met via telephone.[100] The meeting minutes are redacted; what is disclosed does not include any discussion about a change in the unit accrual rate from $0.11 to $0.285.[101] In the Board resolutions, the Board purported to approve the public issuance of units on "substantially the terms set forth in the term sheet previously provided to the Board."[102] Yet a redline comparison of the February 8 term sheet previously provided to the Board and the term sheet actually approved by the Board on February 15 reveals a substantial *change*, from the $0.11 guaranteed accrual to a $0.285 guaranteed accrual.[103] Moreover, on the same day as the February 15 board meeting, a Perella employee outlined the differences between the "Old Plan" and the "New Plan."[104] The "Old Plan" allowed

---

[98] An email from Latham on February 25, 2016 stated that the attached February 25, 2016 redline was "marked to the last version distributed in the [February 15, 2016 at 9:56 am] email below." JX285.0001.

[99] *Compare* JX 202.0004–6, *with* JX 285.0024.

[100] JX 213.0001.

[101] *Id.* at .0001–02.

[102] JX 220.0001.

[103] JX 219.0019–20.

[104] JX 216.0001; JX 219.0001.

for an $0.11 distribution per quarter, while the "New Plan" guaranteed $0.285 in quarterly accruals[105] (the "Revised Terms").

Long testified that, at the February 15 meeting, he gave a report on his February 13 conversation with Chappel—the one in which, according to Long, Chappel stated that "he was not going to allow [Williams Co.'s] auditors to provide the consent" necessary to consummate the public offering.[106] Thus, the evidence supports the conclusion that the Board knew on February 15 that Williams Co. would likely refuse to take the steps required for ETE to complete the public offering. The record is silent as to whether ETE bothered to communicate the Revised Terms to Williams Co.

On February 18, Long emailed Chappel "to follow up concerning ETE's proposed offering of convertible preferred units *that we discussed last Friday*. I know that our respective legal counsels have spoken and I understand that Williams has taken the view that its *consent* to the offering is *required* under the merger agreement."[107] Chappel responded that "[t]he Williams Board unanimously concluded not to consent to the proposed offering. Accordingly, we have advised Williams' external auditors not to work on their consent, as ETE is not entitled to

---

[105] JX 216.0001; Trial Tr. 321:7–322:2.
[106] Trial Tr. 315:12–316:11.
[107] JX 244.0002 (emphasis added).

18

proceed with this offering without the consent of Williams' Board."[108] Thus, ETE would not be able to consummate the public offering. Long testified that he was "floored" by Williams Co.'s refusal, and his colleagues at ETE similarly claimed to be "very disappointed."[109] But, as noted above, this testimony is not credible, because Long himself admitted that on February 13, Chappel had already told him that he (Chappel) would not allow Williams Co.'s auditors to provide the consents.[110] And Long admitted that he shared this conversation with the Board on February 15—three days before the February 18 email exchange with Chappel.[111]

At the February 15 meeting, the Board approved the public offering of convertible preferred units.[112] The plan involved offering securities to all unitholders. A participating unitholder would receive one security for each common unit she elected to participate (the "Participating Units").[113] In return, she would forgo quarterly distributions payable on common units above $0.11 per unit for eight quarters.[114] During the plan period, the securities and Participating Units could not be transferred.[115] After the plan period, each security would convert into a fraction of a common unit based on the security's "Conversion Value" divided by the

---

[108] *Id.*
[109] Trial Tr. 260:19, 261:9–12.
[110] *Id.* at 315:12–316:11.
[111] *Id.*
[112] JX 213.0002; JX 220; Trial Tr. 254:3–255:6.
[113] JX 219.0003.
[114] *Id.*
[115] *Id.* at .0004.

19

"Conversion Price."[116]   The Conversion Value would increase each quarter by $0.285 minus the distribution paid to the unitholder.[117]  The Conversion Price would be 95% of the five-day volume-weighted average closing price of ETE's common units at the time of the offering.  This five-percent discount was purportedly designed to encourage participation by common unitholders.[118]  It was lower than the discount (10-15%) suggested for that purpose by Perella.[119]

Several features of the public offering as approved by the Board on February 15 bear emphasis.  First, if ETE cut common distributions to zero during the plan period, each security would still receive a quarterly accrual of $0.285.[120]  Thus, as Perella put it, "accretion is realized all the [way] up to 29c even with no distribution," so there was "limited downside to no distribution."[121]  Put differently, even if the common unitholders received nothing in a given quarter, the securities would be entitled to receive $0.285 in deferred value.[122]  Second, if ETE kept common distributions flat at $0.285 per quarter, each security would receive a $0.11 cash distribution per quarter plus a $0.175 quarterly accrual.[123]  On the other hand, if ETE raised common distributions to, say, $0.40 per quarter, each security would be

---

[116] *Id.*
[117] *Id.*
[118] JX 103.0004; Trial Tr. 257:3–7, 472:21–475:15.
[119] *Id.*
[120] JX 216.0001.
[121] JX 225.0001.
[122] JX 216.0001.
[123] *Id.*

20

entitled only to a $0.11 quarterly cash distribution plus a $0.175 accrual.[124] If, however, $0.40 per quarter was declared, at the discretion of the General Partner, to be an "Extraordinary Distribution," securities would be entitled to receive that amount as a quarterly cash distribution.[125] "Extraordinary Distribution" was defined to include any non-cash distribution or "any cash distribution that is materially and substantially greater, on a per unit basis, than the Partnership's most recent regular quarterly distribution, as determined by [the] general partner."[126]

According to ETE, the purpose of the proposed public offering was to help the company reduce its leverage.[127] ETE expected to issue the entire $1 billion of equity allowed under the merger agreement it had entered into with Williams Co., and it expected to save the same amount via the public offering.[128] In making these predictions, ETE assumed (i) a 68% participation rate among common unitholders, and (ii) cash savings of $0.175 per unit per quarter during the plan period.[129] Nevertheless, a member of the Perella team commented at the time that, "[i]f cash distributions on common units are cut to zero, the preferred . . . distributions don't

---

[124] *Id.*
[125] JX 219.0007.
[126] *Id.*
[127] JX 213.0001.
[128] Trial Tr. 257:8–17, 405:9–17, 480:19–24; Long Dep. 45:20–47:17; JX 214.0006–07.
[129] Trial Tr. 284:3–19; JX 212.0059; Long Dep. 46:1–7.

conserve cash in and of themselves – rather, they represent a wealth transfer from non-participating to participating units."[130]

Long had met with the rating agencies before the February 15 meeting to discuss the terms of the proposed public offering.[131] After the Board approved the issuance, Long attended additional meetings with the agencies in which he explained how the public offering would help ETE "get[] ahead of the big downturn in the commodity markets that we were seeing."[132] The rating agencies were "very positive" about the plan.[133] Moreover, they told Long that the securities would be treated as equity rather than debt, a decision that was important to him.[134] Notably, Plaintiff Lee Levine testified that he would not have suffered any harm if ETE had consummated the public offering.[135] Similarly, Murray Beach, the Plaintiffs' expert, conceded that a public offering of securities would be inherently fair and reasonable.[136] Beach also testified that he would not object to a situation in which ETE engaged in a public offering, but the only participants were those that in fact participated in the private offering (the "Private Offering," as described below).[137]

---

[130] JX 217.0002.
[131] *E.g.*, JX 193.0001.
[132] Trial Tr. 259:5–15.
[133] *Id.* at 259:16–17; *see also id.* at 397:11–398:2; JX 450.0002.
[134] Trial Tr. 257:18–258:8.
[135] *Id.* at 15:7–14; *see also* JX 644.0009 ("Plaintiff does not allege that he would have suffered harm had ETE offered the Convertible Units to all ETE common unitholders through the planned public offering."); JX 645.0008 (same).
[136] Trial Tr. 58:4–7.
[137] *Id.* at 58:8–16.

As just noted, Williams Co.'s refusal to obtain the necessary consents meant that ETE could not consummate the public offering. Thus, on February 22, 2016, the Board decided to change course and pursue the Private Offering of securities.[138] Notably, a private placement would not require Williams Co.'s consent.[139] Long testified at trial about the thinking behind pursuing a private placement:

> We've done all the work on this. We've done all the analysis on it. It's a great instrument. The rating agencies have been very pleased with it. What do we do? We decided at that point that we would go into what we call a . . . private placement, which, you know, we've done private placements before . . . on the equity side. It's not something that's new to us. It's something we're actually pretty experienced at. And we decided to go that path.[140]

The terms of the Private Offering were largely the same as those of the public offering embodying the Revised Terms approved on February 15.[141] To repeat, those terms were amended substantially from the Initial Terms the Board had been considering, before February 15, with Perella's guidance. Significantly, at the February 15 meeting, the Board was informed of for the first time, and approved, the guaranteed accrual term the Perella had described as a "wealth transfer" to subscribers in case distribution were cancelled.[142] In addition, in ultimately approving the Private Offering on February 28, the Board approved two additional

---

[138] *Id.* at 261:21–262:9, 407:8–17; JX 258.0001.
[139] JX 258.0001.
[140] Trial Tr. 261:23–262:9.
[141] *Compare* JX 219.0003–04, *with* JX 410.0001–02.
[142] JX 219.0019–20.

changes. First, the plan period was extended from eight to nine quarters.[143] Second, electing unitholders would be allowed to transfer their securities and Participating Units during the plan period if they received permission from the General Partner.[144] The discretion of the General Partner to waive the transfer restrictions was uncabined by the terms of the Private Offering.[145]

The plans and their changes may be summarized as follows:

| Term | February 12 Initial Terms | February 15 Revised Terms | February 28 Private Issuance |
|---|---|---|---|
| Minimum Quarterly Accrual or Cash | $0.11 | $0.285 | $0.285 |
| General Partner Waiver for Transfers | No | No | Yes |
| General Partner Waiver for Extraordinary Distributions | Yes | Yes | Yes |
| Timeframe | 8 quarters | 8 quarters | 9 quarters |

#### 4. The Conflicts and Audit Committees Approve the Issuance

At the February 22 meeting where it agreed to pursue the Private Offering, the Board also decided to establish "a conflicts committee made up of Messrs. Collins, Williams and Turner" to evaluate the proposed transaction.[146] Collins and

---

[143] JX 410.0002.
[144] *Id.*
[145] *Id.*
[146] JX 258.0002.

Bill Williams were both long-time friends of Kelcy Warren, who had asked them to join the Board.[147] Before his appointment to the Board, Williams had never served as a director, and prior to the events of this case, he had never been on a conflicts committee.[148] Williams' background is in engineering; before his retirement in 2011, he had served as ETP's Vice President of Engineering and Operations and Vice President of Measurement.[149] As of February 12, 2016, Williams owned 5,399,835 ETE common units, and he did not participate in the issuance of securities.[150] For his part, Collins held 351,639 ETE common units as of February 12, 2016, and he also did not participate in the issuance.[151]

As it turned out, neither Collins nor Turner was eligible to serve on the Conflicts Committee. Under ETE's limited partnership agreement (the "LPA"), the Conflicts Committee could not include directors who were "officers, directors or employees of any affiliate of the General Partner."[152] Turner served on the Sunoco board, and Collins was an ETP director;[153] both of those entities were "affiliate[s] of the General Partner."[154] Thus, Bill Williams was the only member of the Conflicts

---

[147] Trial Tr. 190:13–20; Aug. 24, 2016 Williams Dep. 13:9–16, 16:8–12; Collins Dep. 13:19–15:2.
[148] Aug. 24, 2016 Williams Dep. 13:6–8, 76:7–11.
[149] PTO ¶ 50; Trial Tr. 188:21–22.
[150] PTO ¶ 48.
[151] *Id.* ¶ 40.
[152] JX 1.0008.
[153] JX 315.0001.
[154] *Id.*

Committee—as established by the Board on February 22—who was actually eligible to serve.

At some point after the February 22 meeting, Turner told General Partner director Matthew Ramsey that he was ill and would not be able to serve on the Conflicts Committee.[155] Ramsey, in turn, shared the news with Thomas Mason, ETE's general counsel.[156] Later, on February 24, Mason informed investment bank Moelis & Company that "[t]he two members of the Conflicts Committee are Ted Collins and Bill Williams" and that "the Conflicts Committee needs to make the decision to hire Moelis."[157] Yet the Board never designated a two-man Conflicts Committee, and Moelis was never engaged to advise the Conflicts Committee, apparently because it had a conflict.[158] In any event, Mason told Williams that the Conflicts Committee should hire FTI Consulting, Inc. and Akin, Gump, Strauss, Hauer and Feld, LLP as financial and legal advisors, respectively.[159] Williams testified that if FTI and Akin Gump were good enough for Mason, they were good enough for him.[160] Williams also testified that Mason was responsible for selecting Collins to chair the Conflicts Committee.[161]

---

[155] Trial Tr. 506:12–21.
[156] *Id.* at 506:21–507:3.
[157] JX 272.0001.
[158] Conly Dep. 35:22–36:12.
[159] Aug. 24, 2016 Williams Dep. 74:7–75:7.
[160] Trial Tr. 152:8–10.
[161] Aug. 24, 2016 Williams Dep. 86:17–20.

Meanwhile, ETE's lawyers at Latham realized that Collins and Turner were ineligible to serve on the Conflicts Committee.[162] Latham made this discovery on the morning of February 26—the day the Committee held its first meeting.[163] Latham also realized that the LE GP LLC agreement required that a separate committee—the Audit and Conflicts Committee (the "A&C Committee")—approve the issuance as well.[164] The A&C Committee was a standing Board committee; at the time, it consisted of Williams, Collins, and Turner.[165]

Having made these belated discoveries, Latham and Akin Gump decided on February 26 to create "revised resolutions" for the February 22 meeting.[166] The "revised resolutions" purportedly reflected the Board's decision to have (i) Williams serve as the sole member of the Conflicts Committee, and (ii) Williams and Collins serve as members of the A&C Committee.[167] Specifically, Latham's "revised resolutions" stated that the Board "appoints Messr. Williams to serve as the sole member of the Conflicts Committee," and that "Ted Collins, Jr. and Messr. Williams comprise a majority of the members of the 'Audit and Conflicts Committee.'"[168] The minutes of the February 22 meeting do not match these purported resolutions:

---

[162] JX 315.0001
[163] *Id.*
[164] *Id.*
[165] JX 405.0119.
[166] JX 318.0001
[167] *Id.* at .0007–10.
[168] *Id.*

the Board appointed "Messrs. Collins, Williams and Turner" to the Conflicts Committee, and there is no mention in the minutes of the A&C Committee.[169] Moreover, as discussed below, there is no evidence in the record that the Board ever adopted Latham's "revised resolutions."

Also on February 26, Latham learned from Mason that Turner was in fact unable to serve on the A&C Committee.[170] Latham then informed Akin Gump that Mason did not "have any issues with our single member Conflicts Committee and allowing the Conflicts Committee to review and evaluate the transaction with the Audit and Conflicts Committee."[171] In other words, Bill Williams would serve as the sole member of the Conflicts Committee, which would evaluate the issuance alongside the A&C Committee, of which he formed half the membership.

The Board never held a meeting to reconstitute the Conflicts Committee.[172] Within a few days of the February 22 meeting, however, the directors individually learned that Williams would be the Committee's sole member.[173] Several directors testified that they did not see any problem with Williams serving as a one-man Conflicts Committee.[174] Warren thought Williams would "do his duty" because

---

[169] JX 258.0001–02.
[170] JX 813.0001.
[171] *Id.*
[172] Trial Tr. 515:4–6; Aug. 24, 2016 Williams Dep. 157:23–158:15.
[173] Trial Tr. 410:9–411:1, 512:18–20; JX 330.0001.
[174] Trial Tr. 411:2–4, 507:22–508:1; McCrea Dep. 67:8–11.

"he's a very capable, very knowledgeable guy, plus he had financial advisors and legal advisors as well."[175] Ramsey, a General Partner director, felt the same way:

> I've known Bill Williams for probably 25 years. There couldn't be a more honest person in the world than Bill Williams. He's also a large unitholder at ETE. So he had every reason in the world to look out for the best interest of the partnership. He's smart, he's a very, very good engineer and worked for the company for a number of years, and I was completely comfortable with him doing the analysis and . . . making a recommendation to the full board.[176]

McCrea, another General Partner director, similarly explained that he was comfortable with Williams serving as a one-man Conflicts Committee because "he is an independent director, has been in the industry and knowledgeable of this business for . . . 60 years probably."[177]

The Conflicts Committee purportedly held its first meeting on the afternoon of February 26, 2016.[178] The meeting was a telephone conversation between Williams and Christine LaFollette of Akin Gump, and the minutes reflect that it lasted twenty minutes.[179] The minutes also reflect that Williams approved engaging Akin Gump to provide legal advice to the Conflicts Committee, and that Williams and LaFollette discussed the Committee's duties and the possible engagement of FTI as the Committee's financial advisor.[180] LaFollette apparently explained to Williams

---

[175] Trial Tr. 411:6–9.
[176] *Id.* at 508:4–13.
[177] McCrea Dep. 68:13–16.
[178] JX 324.
[179] *Id.* at .0001–03.
[180] *Id.* at .0002–03.

that he would serve a "dual role" "as the sole member of the Committee and, along with . . . Collins, as a member of the Audit and Conflicts Committee."[181] Williams then supposedly told LaFollette that he was familiar with the terms and purpose of the scuttled public offering, since he had been serving on the Board when it was considering that transaction.[182] Finally, Williams purportedly told LaFollette to set up a meeting with FTI for the morning and afternoon of February 27 to discuss the issuance.[183]

Again, the minutes say the February 26 meeting lasted twenty minutes.[184] And Williams testified that the meeting lasted somewhere between fifteen and thirty minutes.[185] But the phone records Williams produced in this litigation reflect only a twenty-seven-second phone call from LaFollette on February 26.[186] Williams' counsel represented that those phone records were "the relevant phone records covering the meetings of the Conflicts Committee."[187] The weight of the evidence, then, suggests that the February 26 meeting did not take place as described in the minutes. It also bears mentioning that on the morning of this purported meeting, Collins had signed an engagement letter with FTI, supposedly in his capacity as

---

[181] *Id.* at .0002.
[182] *Id.* at .0003.
[183] *Id.*
[184] *Id.*
[185] Aug. 24, 2016 Williams Dep. 97:6–8; Trial Tr. 156:22–23.
[186] JX 702; Trial Tr. 159:11–163:7.
[187] JX 814.0001; *see also* JX 815.

"Chairman" of the Conflicts Committee.[188] Indeed, Collins apparently did not learn he would not serve on the Conflicts Committee until February 27, one day *after* the purported February 26 meeting.[189] There is no record that he attended the February 26 meeting, however.

In any event, the Conflicts Committee and the A&C Committee held a joint telephonic meeting on the morning of February 27.[190] Williams, Collins, Akin Gump, and FTI attended the meeting.[191] FTI began by discussing its experience in MLP transactions.[192] It then described the purpose and terms of the proposed issuance, explaining "its goal of aiding in the reduction of the Partnership's outstanding debt to a ratio of less than 4.0x EBITDA, by conserving cash for debt reduction by allowing certain common unitholders to . . . forgo a significant portion of the distributions on their common units."[193] FTI ended by describing the report it would provide the Conflicts Committee regarding the proposed issuance, and Williams requested that FTI include in this report "an analysis of the pro forma results to the Partnership of the Proposed Transaction in the alternative events where

---

[188] JX 306.0001, .0011.
[189] JX 819.0002.
[190] JX 333.
[191] *Id.* at .0001.
[192] *Id.* at .0002.
[193] *Id.*

31

the Partnership's pending merger with The Williams Companies, Inc. is or is not consummated."[194]

The Conflicts Committee and the A&C Committee met again that afternoon.[195] FTI provided its analysis of the proposed issuance.[196] It explained that it had obtained Perella's financial model, which it modified "to reflect (i) the extension of the proposed Plan Period from 8 quarters to 9 quarters and (ii) certain assumptions made regarding synergies resulting from the Partnership's planned merger with The Williams Companies, Inc."[197] FTI stated that the proposed issuance would be "a valuable mechanism to aid in the reduction of the Partnership's outstanding debt to a ratio of less than 4.0x EBITDA."[198] Williams purportedly asked a question about a chart in a Perella presentation he had reviewed about three weeks before in connection with a meeting of the General Partner and ETP boards.[199] But Williams admitted he did not have a copy of the Perella presentation at the time of the February 27 meeting, and indeed FTI sent it to him a mere two minutes before that meeting ended.[200]

---

[194] *Id.*
[195] JX 347.
[196] *Id.* at .0002.
[197] *Id.*
[198] *Id.*
[199] *Id.*; Trial Tr. 174:5–11.
[200] Trial Tr. 174:12–14; JX 348; JX 360.

The Conflicts Committee and the A&C Committee met one last time on the morning of February 28.[201] The meeting started with Williams "ratify[ing] and adopt[ing] the FTI engagement letter," which Collins had signed two days earlier.[202] Long and Mason then explained to the Committees the purpose of the proposed issuance, which (to repeat) was to "reduc[e] the ratio of the Partnership's outstanding debt to EBITDA to less than 4.0x."[203] Long explained at trial that he "reinforced once again how important [the issuance] was from a rating standpoint."[204] Later in the meeting, Williams asked FTI to present its final report to the Committees;[205] Williams testified that he could not recall whether he had read the report before the meeting.[206] FTI made its presentation, explaining the terms of the issuance and setting out its projections of the impact of the issuance in various scenarios.[207] Specifically, FTI projected that if the issuance took place at a participation rate of 61%, ETE's leverage ratio would be 4.2x by the first quarter of 2018.[208] If, however, ETE did not go through with the issuance, the leverage ratio would reach 4.5x by that time.[209] If ETE went ahead with the issuance and was able to renegotiate certain

---

[201] JX 391.
[202] *Id.* at .0002.
[203] *Id.*
[204] Trial Tr. 265:20–21.
[205] JX 391.0004.
[206] Trial Tr. 217:2–4.
[207] JX 391.0004.
[208] *Id.*; Trial Tr. 551:1–7.
[209] JX 391.0004.

Williams Co. contracts, the ratio would be 3.9x by the first quarter of 2018.[210] On the other hand, if the merger with Williams Co. did not close, the ratio would decline to 2.8x by that time even without the issuance.[211] FTI ultimately concluded that, even if ETE could not achieve the projected 61% participation rate, there was still value in doing the issuance.[212] Nothing in the record indicates that FTI described the specific accrual or conversion terms as desirable as compared to other potential terms, and there is no indication either Committee considered the fairness of those terms to ETE.

After FTI gave its presentation, the A&C Committee voted to approve the proposed issuance.[213] Collins then left the meeting, and Williams, acting as the sole member of the Conflicts Committee, approved the issuance as well.[214] Williams testified at trial that he voted in favor of the transaction because "it appeared to me that this is exactly what we needed," namely, "generat[ing] cash to reduce the debt."[215] Notably, a "WHEREAS" clause in the resolution formalizing the Conflicts Committee's approval stated that "the Board resolved on February 22, 2016 to

[210] *Id.*
[211] *Id.*
[212] Trial Tr. 551:11–16; *see also* JX 391.22 ("[T]he Company expects to employ additional measures to reduce its leverage ratio from approximately 5.0x in Q1 2016 to 4.2x by the end of Q1 2018 . . . .").
[213] JX 391.0005.
[214] *Id.*
[215] Trial Tr. 187:20–21, 212:5–6.

34

establish a Conflicts Committee . . . consisting solely of Mr. William P. Williams."[216] That was untrue: the Board had resolved on February 22 to create "a Conflicts Committee made up of Messrs. Collins, Williams and Turner."[217]

While FTI's representative testified that Williams was "engaged" during the February 27 afternoon meeting,[218] and the Conflicts Committee's minutes reflect that he asked questions during the meetings,[219] Williams' own testimony makes clear that he did not understand several important aspects of the transaction he approved.[220] For example, Williams did not understand how the quarterly distributions worked, and he did not know how the $0.11 preferred payment term had been determined.[221] Williams apparently believed that the securities had no cost to ETE; when asked to provide a basis for that belief, he explained that he "just felt like it didn't cost ETE anything to do this."[222] Notably, Williams never considered how the securities would affect ETE if the company cut its common distributions.[223]

---

[216] JX 391.0025.
[217] JX 258.0002.
[218] Trial Tr. 539:9–13.
[219] *E.g.*, JX 347.0002.
[220] Trial Tr. 178:5–179:21.
[221] *Id.* at 180:12–15; Aug. 24, 2016 Williams Dep. 51:25–52:4.
[222] Aug. 24, 2016 Williams Dep. 166:7–12.
[223] Trial Tr. 183:4–9.

## 5. The Board Approves the Issuance, and the Securities Are Issued

The Board met on the afternoon of February 28 to discuss the proposed Private Offering.[224] Warren had scheduled this meeting on February 26 on the assumption that, by February 28, the Conflicts Committee would be finished with its work.[225] At the February 28 meeting, the Board heard presentations from Mason, FTI, Akin Gump, and Williams.[226] According to the minutes, LaFollette, the Akin Gump attorney, told the Board that Collins, Turner, and Williams "had acted as a 'special committee' of the Board."[227] In fact, there is no evidence that ETE ever formed such a "special committee," or that those three individuals served together in any capacity related to the issuance. In any event, the Board unanimously approved the issuance, an amendment to the LPA ("Amendment 5"), a private placement memorandum, and related transactions.[228] The resolutions memorializing these decisions contained a "WHEREAS" clause stating that "the Board previously authorized the formation of a Conflicts Committee . . . consisting of William P. Williams."[229] Again,

---

[224] JX 382.
[225] JX 295.0001.
[226] JX 382.0001–02.
[227] *Id.*
[228] *Id.* at .0002; JX 394.0147–49; Trial Tr. 408:8–9. The Plaintiffs point out that after the Board approved Amendment 5 and the private placement memorandum, Latham made several changes to the documents that were not formally approved by the Board. JX 395.0001. For example, Amendment 5's tax allocation provisions were changed to "use book gain or book loss as opposed to taxable income or deduction to true up at the end of the conversion period." JX 388.0001; *see also* JX 395.0247. And the private placement memorandum was altered to, among other things, calculate $6.56 as the Conversion Price. JX 395.0118.
[229] JX 384.0005.

however, that was untrue; the Board had actually authorized the formation of a Conflicts Committee consisting of Williams, Turner, and Collins. Another "WHEREAS" clause stated that "the Board has reaffirmed its delegation of authority to the Conflicts Committee and the A&C Committee with respect to the Proposed Transaction and the Related Arrangements."[230] Importantly, setting aside the "WHEREAS" clauses just mentioned, the February 28 resolutions do not contain any provision resolving to ratify the decision to use a one-man Conflicts Committee.[231]

Warren testified that he voted in favor of the issuance because "[t]he rating agencies were calling our chief financial officer, saying, When are you going to announce this? And the rug had been pulled out from under us by Williams. So we felt the need to move quickly and demonstrate to the rating agencies that we were doing this."[232] McCrea, for his part, explained that "[w]e had to do something. This was the lowest risk, quickest thing we could do to start addressing our leverage concerns."[233] Ramsey similarly thought that the issuance "was the absolute best path on the private and also subsequently on the public offering to start the delevering process and satisfy the rating agencies."[234] Notably, when ETE approved the

---

[230] *Id.* at .0006.
[231] JX 384.0007–10.
[232] Trial Tr. 408:21–409:3.
[233] McCrea Dep. 65:24–66:2.
[234] Trial Tr. 512:6–9.

issuance, the General Partner directors and their advisors believed that the merger with Williams Co. would close.[235]

After the issuance was approved, ETE offered securities to several individuals and entities,[236] including Warren, McReynolds, McCrea, Ramsey, Ray Davis, and Richard Brannon.[237] McReynolds decided to participate with approximately 85% of his common units, while McCrea elected to participate with only half of his units.[238] A member of the Perella team noted at the time that "[o]nly 3 institutions, Kayne [Anderson], Tortoise and Neuberger [Berman]" were invited to participate, and that there were "some aunts & uncles" on the list of individual invitees.[239] Notably, ETE had over 400 institutional investors at the time of the issuance.[240]

About half of the invitees listed in a document titled "LIST FOR PPM" were "unrelated parties," meaning "people who are not officers or directors at Energy Transfer, are not 5 percent owners and are not family members of any of those two categories."[241] On the other hand, several of these "unrelated" invitees were former employees of the ETE family or relatives of insiders.[242] In total, at least 70% of the individuals on the "LIST FOR PPM" were either affiliated with ETE in some

---

[235] *Id.* at 253:11–13, 413:7–17, 458:13–17.
[236] *E.g., id.* at 513:6–9.
[237] PTO ¶¶ 30, 37, 52, 55, 58, 63.
[238] *Compare id.* ¶¶ 37, 52, *with* JX 436.0008.
[239] JX 398.0002.
[240] Trial Tr. 123:21–22, 310:18–5.
[241] *Id.* at 513:1–514:3; JX 407.
[242] Trial Tr. 514:9–16; McReynolds Dep. 140–21–147:5; JX 407.

capacity or related to individuals with such an affiliation.[243] Moreover, contrary to FTI's assumption that ETE would achieve a 61% participation rate, only about 31.5% of ETE's outstanding common units ended up participating in the issuance.[244]

Kayne and Tortoise, both of which are sophisticated institutional investors, chose not to participate in the issuance.[245] Kevin McCarthy, one of Kayne's co-managing partners, explained that Kayne "didn't think the security was attractive enough to participate. We thought that the liquidity constraints given the time in the marketplace and the uncertainty with the Williams merger was not being offset by attractive enough economics."[246] McCarthy further explained that Kayne chose not to participate for purely business reasons.[247] Specifically, Kayne calculated that the securities would offer a return that was only 3.8% higher than that offered by ETE's common units.[248] Tortoise also declined to participate, apparently because the discount offered by the securities was insufficient to justify the lack of liquidity.[249] Neuberger participated, but with only one-sixth of its common units.[250]

---

[243] This list does not include Kelcy Warren or his wife, both of whom participated in the issuance. JX 407; PTO ¶ 103.

[244] PTO ¶ 101.

[245] McCarthy Dep. 95:19–96:18, 97:7–98:4; Trial Tr. 269:2–3.

[246] McCarthy Dep. 97:22–98:4.

[247] *Id.* at 98:11–13.

[248] JX 416.0003.

[249] Trial Tr. 270:18–271:1.

[250] JX 281; JX 638.

Fitch, one of the three major rating agencies, described the issuance as "a proactive step in enhancing [ETE's] liquidity and managing acquisition leverage in a credit-neutral manner."[251]  Fitch also noted that the issuance had "no immediate impact to ETE's ratings," and that it considered the securities to be equity.[252]  Long testified at trial that based on his meetings and phone calls with the agencies, he believed that they saw the issuance as "very much a positive step."[253]  Long also suggested that issuing the securities prevented negative credit-rating actions.[254]  Notably, ETE's unit price did not experience a statistically significant decline in the wake of the issuance.[255]

On April 18, 2016, about two months after the Board approved the Private Offering, ETE filed an updated Form S-4 announcing that it did "not expect to make any cash distributions with respect to its common units prior to the distribution payable with respect to the quarter ending March 31, 2018.[256]  According to Long, this announcement meant that ETE was certain to cut distributions if the merger with Williams Co. closed.[257]  Long testified that ETE decided to cut distributions after it

---

[251] JX 504.0001.
[252] *Id.*
[253] Trial Tr. 224:9–13.
[254] *Id.* at 225:5–8.
[255] *E.g.*, *id.* at 596:17–20.
[256] JX 550.0046.
[257] Trial Tr. 278:10–14.

40

received updated projections from Williams Co. on April 7.[258] Those projections, Long explained, showed that expected EBITDA and distributable cash flow had dropped significantly compared to earlier projections.[259] Moreover, while Williams Co. initially described these updated projections as "the Downside Case,"[260] Williams Co. later claimed on April 15 that "additional adjustments" were not necessary to make them the most realistic set of projections.[261]

### 7. The Merger Does Not Close, and ETE Decides Not to Cut Distributions

When the issuance took place, ETE and its advisors expected that the merger with Williams Co. would close.[262] For reasons that are irrelevant to the analysis here, ETE ultimately terminated the merger agreement on June 29, 2016.[263] ETE ended up not cutting distributions: About a month after the merger was terminated, ETE announced that its distributions to common unitholders would stay flat at $0.285 per unit.[264] On October 26, 2017, ETE announced that it would increase its quarterly distributions to $0.295 per common unit.[265] And, in February 2018, ETE raised distributions again, this time to $0.305 per common unit.[266] The plan period

---

[258] *Id.* at 274:2–10; JX 534; *see also* McCrea Dep. 73:20–74:25.
[259] Trial Tr. 274:16–275:4.
[260] JX 534.0001.
[261] JX 546.0001.
[262] Trial Tr. 253:11–13, 413:7–17, 458:13–17.
[263] *Williams Cos., Inc.*, 2016 WL 3576682, at *2; PTO ¶ 105.
[264] PTO ¶ 106.
[265] *Id.* ¶ 107.
[266] JX 701.0001.

for the securities is set to end on May 18, 2018, at which point the securities will convert into common units based on the formula described above.[267]

### C. This Litigation

Plaintiff Lee Levine commenced this action on April 12, 2016, and I granted his request for expedition on April 22, 2016. The action was consolidated with a similar matter on May 3, 2016. Discovery commenced, and an amended complaint was filed on August 29, 2016. The Complaint contains four counts, and they boil down to the assertion that the issuance (and related transactions) breached various provisions of the LPA.[268] The parties cross-moved for summary judgment on September 28, 2016; I denied those motions on February 28, 2017, and July 31, 2017.[269]

The case proceeded to trial, from February 19, 2018, to February 21, 2018. In post-trial briefing, the Plaintiffs advanced two primary theories of liability. First, the Plaintiffs argue that the issuance was a non-pro-rata distribution of Partnership Securities in violation of Section 5.10(a) of the LPA. Second, the Plaintiffs argue that the issuance violated Sections 7.6(f) and 7.9 of the LPA, which address conflict transactions. According to the Plaintiffs, these breaches of the LPA render the

---

[267] PTO ¶ 104.
[268] Compl. ¶¶ 162–202.
[269] *In re Energy Transfer Equity L.P. Unitholder Litig.*, 2017 WL 782495, at *2 (Del. Ch. Feb. 28, 2017); *In re Energy Transfer Equity L.P. Unitholder Litig.*, 2017 WL 3500224, at *1 (Del. Ch. July 31, 2017).

securities "void and a nullity."[270]  The Plaintiffs therefore seek cancellation of the

securities and a permanent injunction preventing the conversion or transfer of the

units.  Also pending is the Plaintiffs' request for class certification under Court of

Chancery Rule 23.[271]

## II. ANALYSIS

### A. I Find No Violation of LPA Section 5.10(a)

The Plaintiffs argue that the private issuance is a "distribution," and as such,

was required to be pro rata.  Because it was not, per the Plaintiffs, the issuance is

void.  The Plaintiffs rely on Section 5.10(a), which states:

> Subject to Section 5.8(d), the Partnership may make a *Pro Rata distribution* of Partnership Securities to all Record Holders or may effect a subdivision or combination of Partnership Securities so long as, after any such event, each *Partner* shall have the *same Percentage Interest* in the Partnership *as before such event*, and any amounts calculated on a per Unit basis or stated as a number of Units are proportionately adjusted.[272]

The term "distribution" is not defined in the LPA.[273]  The Defendants counter

that a distribution is a transfer to partners of value, not an offer to sell securities as

took place here.  They point to the common English meaning of distribution and,

---

[270] Pls.' Opening Post-Trial Br. 62.
[271] Because of my decision here, I do not address class certification, which is opposed by ETE. The parties should inform me, in light of this Memorandum Opinion, whether I need to address the issue of class certification.
[272] JX 1.0024 (emphasis added).  A "Record Holder" is the registered owner of a Common Unit. *Id.* at .0011.
[273] JX 1.0005-13; JX 2; JX 4; JX 6; JX 15; JX 451.0003–05.

among other sources, Black's Law Dictionary.[274]   Black's defines a "partnership distribution" as "[a] partnership's payment of cash or property to a partner out of earnings or as an advance against future earnings, or a payment of the partners' capital in partial or complete liquidation of the partner's interest."[275]   All parties agree that "distribution" in the context of the LPA is unambiguous; they simply disagree as to the meaning.  I find the term unambiguous, and that it does not include an issuance of a security for value, as here.

I first note that the LPA provides the General Partner discretion to issue securities on terms it finds appropriate.  Section 5.8(a) allows the Partnership to issue additional Partnership Securities "for any Partnership purpose" and "for such consideration and on such terms and conditions as the General Partner shall determine, all without the approval of any Limited Partners."[276]   Next, while the LPA does not define "distribution," it refers to distributions in several locations.  Section 1.1 defines a "Record Date" as the date established by the General Partner to identify, among other things, the "identity of Record Holders entitled to receive any report or distribution or to participate in any offer."[277]   Section 5.8(b) states that each

---

[274] The Plaintiffs argue that the Defendants' use of extrinsic evidence does not pertain to "the meaning of distribution in the specific context of the specific provisions of this specific Partnership Agreement" and should be ignored.  Pls.' Opening Post-Trial Br. 38.

[275] *Interactive Corp. v. Vivendi Universal, S.A.*, 2004 WL 1572932, at *3 (Del. Ch. June 30, 2004) (citing Black's Law Dictionary 488 (7th ed. 1999)).

[276] JX 1.0023.

[277] *Id.* at .0011.

Partnership Security may be authorized with rights determined by the General

Partner, including "the right to share in Partnership distributions."[278]    Finally,

Section 5.8(d) states that:

> (d) No fractional Partnership Securities shall be issued by the
> Partnership. If a *distribution*, subdivision or combination of Units
> pursuant to Section 5.8 *would result* in the *issuance* of fractional Units,
> each fractional Unit shall be rounded to the nearest whole Unit (and a
> 0.5 Unit shall be rounded to the next higher Unit).[279]

The Plaintiffs point to Sections 5.8(a), 5.8(d) and 5.10(a) to argue that the

LPA uses the term distribution as a type of issuance that may be with or without

consideration or conditions.[280]  Consequently, the "Plaintiffs' principal claim is that

the issuance was a non-Pro Rata distribution of Partnership Securities in violation of

§5.10(a)."[281]

In the alternative, the Plaintiffs argue that, if I find "distribution" in the context

of the LPA to be ambiguous, *contra proferentem* will apply and I must construe the

meaning of distribution in Section 5.10(a) against the Defendants.[282]

---

[278] *Id.* at .0023 (emphasis added).
[279] *Id.* (emphasis added).
[280] Pls.' Opening Post-Trial Br. 3.
[281] *Id.* at 37.
[282] *Id.* at 2–3 (citing *SI Mgmt., L.P. v. Wininger*, 707 A.2d 37, 43-44 (Del. 1988) (applying *contra proferentem* in an insurance contract); *In re Kinder Morgan, Inc. Corp. Reorganization Litig.*, 2014 WL 5667334, at *3 (Del. Ch. Nov. 5, 2014) ("Where a limited partnership agreement was drafted exclusively by the general partner, the court will interpret ambiguities against the drafter, rather than examine extrinsic evidence." (internal quotation marks omitted))).

The Defendants, in turn, argue that "a distribution is a one-way transfer" without consideration.[283] Because, in the Defendants' view, the issuance was a "two-way, value-for-value exchange, it was not a distribution."[284] The Defendants point out that the subscribers exchanged, among other things of value, $518 million in foregone cash distributions over nine quarters[285] in return for the security, providing value—needed cash flow relief—for ETE. Because the Private Offering was not a distribution, Section 5.10(a) does not apply.[286]

## 1. The Term Distribution Is Not Ambiguous

"Limited partnership agreements are a type of contract," and must be construed "in accordance with their terms to give effect to the parties' intent."[287] To determine the parties' intent,

> [w]e give words their plain meaning unless it appears that the parties intended a special meaning. When interpreting contracts, we construe them as a whole and give effect to every provision if it is reasonably possible. A meaning inferred from a particular provision cannot control the agreement if that inference conflicts with the agreement's overall scheme. We consider extrinsic evidence only if the contract is ambiguous. A contract is not ambiguous simply because the parties do not agree upon its proper construction, but only if it is susceptible to two or more reasonable interpretations.[288]

---

[283] Defs.' Opening Post-Trial Br. 51, 56–58.
[284] *Id.* at 51.
[285] Trial Tr. 34:13–16.
[286] Defs.' Opening Post-Trial Br. 58–59.
[287] *Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 360 (Del. 2013).
[288] *Id.* at 360 (internal citations and quotation marks omitted).

When determining the plain meaning of a particular term in a contract, I may refer to the "ordinary dictionary meaning."[289] However, "more than one dictionary definition" does not itself make a term ambiguous because "if merely applying a definition in the dictionary suffices to create ambiguity, no term would be unambiguous."[290]

The threshold question is whether the term distribution is ambiguous under the LPA. I find that it is not. The use of the term "distribution" in the LPA, read as a whole, refers to something *transferred* to the unitholders, as, for instance, a payment; rather than something that is *offered* to the unitholders for sale, which they may accept or reject. I note that this accords with the definition of partnership distribution in Black's Law Dictionary: "[a] partnership's payment of cash or property to a partner out of earnings or as an advance against future earnings, or a payment of the partners' capital in partial or complete liquidation of the partner's interest."[291]

Not only does this definition comport with the common definition of the term, it is consonant with the LPA as a whole.[292] Section 5.8(a) allows the Partnership to issue Partnership Securities. The General Partner is given discretion to determine

---

[289] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006).
[290] *Id.* (internal quotation marks omitted).
[291] *Interactive Corp.*, 2004 WL 1572932, at *3 (citing Black's Law Dictionary 488 (7th ed. 1999)).
[292] *See Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926 (Del. 2017).

47

the terms and other conditions of an issuance, including the right to share in distributions, in Sections 5.8(a) and (b). The Plaintiffs' interpretation would make nonsense of this provision. It would provide that an issuance of securities would be constrained as a pro rata distribution under Section 5.10(a); a condition that such an issuance, practically, could never meet. The failure of a *single* partner to subscribe would result in a "distribution" which did not result in "each Partner [having] the same percentage interest in the Partnership as before such event."[293] Under the Plaintiffs' view, such an issuance of securities would thus be *ultra vires*, and void. I cannot read the LPA thus without doing damage to its meaning.

The Plaintiffs' attempt to circumvent this problem, I confess, eludes me. As I understand it, the Plaintiffs contend that a sale and issuance of Partnership Securities may constitute a valid distribution under Section 5.10(a), and the pro rata requirement be satisfied, so long as the offer is pro rata, even if certain partners reject the securities.[294] The Plaintiffs do not conflate the offer itself with a distribution, however. They maintained stoutly at oral argument that the securities are in some sense distributed to the partners at the time of the offer, as they metaphorically are laid before the partners, waiting to be picked up. If a partner spurns the transaction, no matter; there has been a pro rata distribution in the placing of the securities within

---

[293] JX 1.0024.
[294] Apr. 16, 2018 Oral Arg. Tr. 36:1–37:23 (DRAFT).

her grasp. In addition to being entirely too metaphysical for my poor abilities, the Plaintiffs' formulation does not comport with the plain language of Section 5.10(a). Section 5.10(a) requires that "*after* any such [distribution], each Partner shall have the *same Percentage Interest* in the Partnership *as before* such [distribution]."[295] In the Plaintiffs' scenario, assuming at least one partner declines to purchase, this condition would be violated.

Section 5.8(a) allows the Partnership to issue Partnership Securities. The General Partner is given discretion to determine the terms and conditions of an issuance in Sections 5.8(a) and (b). Section 5.10, on the other hand, prevents the Partnership from giving—distributing—something to certain unitholders and not to others.

Viewed together, the provisions in the LPA mean that the Partnership cannot give out value, including securities, to some partners *qua* partners, without giving it pro rata to the others. This reading comports with the definition of partnership distribution in Black's Law Dictionary. The securities at issue were not a distribution. They were offered for sale, as the general partner is empowered to do under the LPA. I find the term "distribution," in the context of the LPA, unambiguous. Put another way, a reasonable investor, on reading the LPA, would conclude that he would receive distributions, in cash or kind, from time to time, and

---

[295] JX 1.0024.

that those would be pro rata and would not dilute his interest. He would not conclude that the sale and issuance of equities as provided for in the LPA would result in a pro rata "distribution" of those equites, as the Plaintiffs contend. I find the LPA clear in this regard.

To the extent the Plaintiffs argue that the consideration given by subscribers was illusory, and thus that the issuance was a one-way distribution rather than an exchange, I disagree. The $518 million in forgone distributions was useful to ETE in this situation and represented an opportunity cost and risk of some amount to the participating unitholders. I find that this transaction was an exchange for value. I note that not all the securities offered were subscribed, even by the insiders.

Because I find that the LPA is not ambiguous, and that this was an issuance for value and not a distribution, I need not address the parties' arguments regarding *contra proferentem* or extrinsic evidence. I find that the issuance was not prohibited under Section 5.10(a).

### B. Fair and Reasonable

Having found that the issuance was not a prohibited distribution under the LPA, I next determine whether the issuance was "fair and reasonable" to ETE under Section 7.6(f) of the LPA.[296] Section 7.6(f) provides in relevant part that "[n]either

---

[296] *Id.* at .0031. Both parties agree that, as the more specific provision, Section 7.6(f)—not Section 7.9—controls here. Pls.' Opening Post-Trial Br. 48; Defs.' Opening Post-Trial Br. 31.

the General Partner nor any of its Affiliates shall sell, transfer or convey any property to, or purchase any property from, the Partnership, directly or indirectly, except pursuant to transactions that are fair and reasonable to the Partnership."[297] "The fair and reasonable standard is something similar, if not equivalent to, entire fairness review."[298]

The LPA allows the General Partner to establish, conclusively, that the transaction under review is fair and reasonable to the Partnership by complying with one of several safe harbor provisions. The parties dispute vigorously whether the Defendants have reached safe harbor, a matter I address later in this Memorandum Opinion. I first turn to a predicate issue; burden of proof.

When entire fairness applies in the corporate context, the defendant fiduciaries bear the burden of showing that the challenged decision was entirely fair to the corporation and its stockholders.[299] According to the Defendants, because the LPA eliminates default fiduciary duties and replaces them with purely contractual obligations, the Plaintiffs bear the burden of showing that the issuance was not fair and reasonable to ETE.[300] I disagree. In my view, Section 7.6(f) itself places the

---

[297] JX 1.0031.

[298] *Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 256–57 (Del. 2017) (internal quotation marks and citation omitted).

[299] *E.g.*, *Frederick Hsu Living Trust v. ODN Holding Corp.*, 2017 WL 1437308, at *34 (Del. Ch. Apr. 14, 2017).

[300] Defs.' Answering Post-Trial Br. 14 n.19; *see also* JX 1.0034 § 7.9(e) ("Except as expressly set forth in this Agreement, none of the General Partner, the Board of Directors, any committee of the

burden on the Defendants to show that the issuance satisfied the fair-and-reasonable standard.

This Court confronted a similar issue in *Auriga Capital*.[301] There, then-Chancellor Strine was tasked with interpreting an LLC agreement that provided, in relevant part:

> Neither the Manager nor any other Member shall be entitled to cause the Company to enter . . . into any additional agreements with affiliates on terms and conditions which are less favorable to the Company than the terms and conditions of similar agreements which could be entered into with arms-length third parties, without the consent of a majority of the non-affiliated Members.[302]

The Court held that this language imposed something "akin to entire fairness review" with respect to conflicted transactions.[303] Specifically, the Court read the LLC agreement to allow conflicted transactions without approval from a majority of the minority members, "subject to a proviso that places the burden on the Manager . . . to show that the price . . . was the equivalent of one in an agreement negotiated at arms-length."[304] The Supreme Court affirmed, holding that, because the conflicted transaction at issue did not receive the approval of a majority of the minority, "the burden of establishing the fairness of the transaction fell upon [the manager]."[305]

---

Board of Directors nor any other Indemnitee shall have any duties or liabilities, including fiduciary duties, to the Partnership or any Limited Partner or Assignee.").
[301] 40 A.3d 839.
[302] *Id.* at 857.
[303] *Id.* at 856.
[304] *Id.*
[305] *Gatz Props., LLC*, 59 A.3d at 1213.

Like the LLC agreement in *Auriga*, the LPA here prohibits "sell[ing], transfer[ring] or convey[ing] any property to, or purchas[ing] any property from, the Partnership," subject to (i) an exception for transactions that are "fair and reasonable to" ETE, and (ii) a set of safe harbors.[306]  Thus, once the plaintiff shows that a transaction was conflicted in the manner contemplated by Section 7.6(f), the burden falls to the defendant to prove that the transaction was fair and reasonable to the partnership.[307]  Because there is no dispute that the issuance was a conflicted transaction per Section 7.6(f), the Defendants bear the burden of proving that it was fair and reasonable to ETE.  I turn next to this analysis.

1. The "Safe Harbors"

Under the terms of Section 7.6(f), the Defendants can conclusively show that the transaction was fair and reasonable to ETE by showing they have achieved one

---

[306] JX 1.0034.

[307] The Defendants cite *Zimmerman v. Crothall*, 62 A.3d 676 (Del. Ch. 2013), for the proposition that the Plaintiffs bear the burden of proving that the issuance violated the LPA's fair-and-reasonable standard.  *Zimmerman*, however, is distinguishable.  In that case, the relevant provision of the LLC agreement provided that "Members, Directors, and officers . . . shall have the right to contract . . . with the Company . . . as the Board of Directors shall determine, provided that such payments or fees are comparable to the payments or fees that would be paid to unrelated third parties providing the same property, goods, or services to the Company."  *Id.* at 702.  The Court held that this language effectively required review under an entire fairness standard, with the plaintiff bearing the burden of proving that a conflicted transaction was not entirely fair.  *Id.* at 703–04.  The Court recognized the tension between this holding and *Auriga*, but it found *Auriga* distinguishable: "The *Auriga* provision provides that a manager or member *cannot* cause the company to enter an agreement with an affiliate on terms less favorable than an arm's length transaction without the required consents. By contrast, [the provision here] gives members, directors, or officers the affirmative right to engage in transactions with the Company, provided that such transaction is comparable to a third-party transaction."  *Id.* at 706.  In my view, Section 7.6(f) is closer to the *Auriga* provision than to the *Zimmerman* provision.

53

of four safe harbors. The Defendants rely principally on the use of a Conflicts Committee to approve the transaction. Indeed, the Board indicated it would approve the Private Offering only if approved by a Conflicts Committee.[308] Section 7.6(f) provides that the contractual standard is "deemed satisfied . . . as to . . . any transaction approved by Special Approval," defined as approval by the Conflicts Committee.[309] That Committee is defined as a one or more member committee of the Board composed of directors who are unconflicted and independent: the definition specifically excludes employees and directors of affiliates of the General Partner.[310]

At its February 22 meeting, recognizing the conflicted nature of the proposed Private Offering, the Board created a Conflicts Committee "made up of Messrs. Collins, Williams and Turner" to consider the transaction.[311] That Conflicts Committee was fatally flawed, however. A majority of its members, Collins and Turner, were employee and director, respectively, of affiliates of the General Partner, and thus unfit to serve under the LPA.[312] Only Williams, a retired ETE

---

[308] JX 258. According to the Plaintiffs, this makes the Private Offering void, should I find that no valid Conflicts Committee recommendation exists. I reject this argument; the General Partner is prohibited from conflicted transactions unless "fair and reasonable"; nothing in the LPA requires it to use a particular safe harbor, and the Board's stated intention to rely on one safe harbor does not mean that it breached a contractual duty if the transaction is nonetheless fair and reasonable, despite failure to achieve that particular safe harbor.

[309] JX 1.0032.

[310] *Id.* at 6.

[311] JX 258.0002.

[312] JX 315.0001.

employee and long-time friend of Warren, was eligible to serve on a Conflicts Committee.

In any event, Turner declined to serve due to health reasons. He so informed a single director, but did not formally resign from the Committee.[313] On February 24, ETE's general counsel, Mason, informed a proposed financial advisor that the hiring decision would have to be made by the "two member[]" Committee, composed of Collins and Williams.[314] Mason was calling the shots for the Committee; he chose its financial and legal advisors, and "appointed" Collins as committee chair.[315]

By Febraury 26, however, ETE's outside counsel realized that Collins was ineligible to serve.[316] This counsel and the Committee's outside counsel attempted to address this problem by creating "revised resolutions" for the February 22 meeting, which falsely indicated that Williams was appointed sole member of the Conflicts Committee.[317] This was untrue; at no time prior to when Williams, purporting to act for the Conflicts Committee on February 28, recommended the transaction as fair, did the Board appoint Williams the sole member of the Conflicts Committee.[318] The Board met that same day. The minutes reflect that the

---

[313] Trial Tr. 506:12–21.
[314] JX 272.0001.
[315] Aug. 24, 2016 Williams Dep. 74:7–75:7, 86:17–20.
[316] JX 315.0001
[317] JX 318.0001, .0007–10.
[318] Trial Tr. 515:4–6; Aug. 24, 2016 Williams Dep. 157:23–158:15.

Committee's counsel, Akin Gump, informed the Board that Collins, Turner, and Williams had acted as a "special committee";[319] this was untrue and misleading—the Board had appointed those gentlemen as the Conflicts Committee, but only Williams had ever done any substantive work on the committee, and the other two were ineligible to serve.

As a result, there was no Conflicts Committee created by the Board and in satisfaction of the safe-harbor provision of Section 7.6(f). In order to shelter in the safe harbor of the conclusive presumption, the Board had to create a Conflicts Committee whose members met certain qualifications, and rely on their approval of the transaction. The Defendants point out that the directors, in self-serving testimony, averred that they were individually aware of and in approval of Williams' sole service on the Conflicts Committee; Defendants add that Williams could have acted as a sole member, under the explicit language of the LPA, if he had been so appointed. This is to no avail. The LPA gives the Partnership protection against conflicted transactions with the General Partner and its affiliate, prohibiting them unless they are objectively fair and reasonable. They allow the Board to avoid demonstration by objective proof in four limited ways. One is creating a Conflicts Committee, composed of unconflicted members with defined qualities. Here, the Board failed to do so, and it cannot therefore avoid an objective evaluation of

---

[319] JX 382.0001–02.

whether the transaction is fair and reasonable.  The safe harbor is optional; falling short of reaching harbor does not prevent the Defendants from navigating the straits of fairness.  But having failed to perfect a Conflicts Committee in contractual compliance, they are not entitled to its benefit.

I will not here recite again the various actions of then-counsel for the Conflicts and A&C Committees or ETE in creating a record which is at best misleading as to the actions of the Board in creating the Conflicts Committee; those are laid out adequately in the facts.  Suffice it to say that these actions are not helpful to the Defendants, at all.

The Conflicts Committee was bound to act in good faith.[320]  Since I do not find Williams to have constituted the Conflicts Committee, I need not examine his actions in that regard.   For completeness' sake, however, I note that Williams is a retired engineer.[321]  He testified at trial and by deposition.  I found him truthful and sincere.  Nonetheless, for the reasons laid out in the facts, I found his actions short of the kind of deliberations that should be undertaken in consideration of a conflicted transaction.  It is clear that Williams did not understand his role, which was to ensure fairness to the Partnership, nor did he understand the terms of the transaction on which he was opining.[322]  Williams relied on the Board's previous consideration of

---

[320] JX 1.0034.
[321] PTO ¶ 50; Trial Tr. 188:21–22.
[322] Trial Tr. 178:5–179:21, 180:12–15; Aug. 24, 2016 Williams Dep. 51:25–52:4.

the public offering, but the terms are not the same, and in any event, the Board's consideration of the accrual term of that transaction is problematic, as explained below. Certainly, Williams never explored whether securities with different terms would be better for the Partnership: he treated the issuance as a binary choice; do it, or not.

Having found that the safe harbor of reliance on a Conflicts Committee is not available to the Defendants, I turn to their second, and last, attempt to find such refuge. Section 7.6(f) provides that the contractual standards of a conflicted transaction shall be deemed satisfied so long as its "terms . . . are no less favorable to the Partnership than those generally being provided to . . . unrelated third parties."[323] Unrelated third parties is a term not explicitly defined in the LPA, and the parties dispute its meaning. The Defendants point out that the Private Offering was not just offered to affiliates of the General Partner, family, and friends; it was offered to three (out of four hundred) institutional investors, as well.[324] Therefore, per the Defendants, it is conclusively fair and reasonable. This strikes me as too cute by half.

---

[323] JX 1.0032.

[324] ETE also argues that eighteen unrelated third parties participated in the issuance, which ETE argues qualify as unrelated third parties under Section 7.6(f)(iii) or as outside the scope of "related persons" under SEC regulations. Defs.' Opening Post-Trial Br. 32–33.

Again, the LPA protects the Partnership from conflicted transactions with the General Partner and affiliates, by prohibiting such transactions unless objectively fair and reasonable. Unsurprisingly, the LPA provides that where a market sets the terms of the transaction, that market price provides conclusive proof of objective fairness. If ETE rents warehouse space from an affiliate at market price—that is, at terms no less favorable than those generally provided to third parties—it makes no sense to have a court examine the objective fairness of the transaction. But this analysis does not translate well to issuances of unique securities.

ETE cites *Brinckerhoff* for the proposition that the "generally being provided to unrelated third parties" language "allows MLPs to invoke this safe harbor by comparing the challenged transaction to similar—but not identical—arms-length transactions."[325] I agree. *Brinckerhoff* involved the sale of interests in an energy pipeline MLP.[326] The plaintiff there alleged that the defendant "paid $200 million more to repurchase the same assets it sold in 2009, despite declining EBITDA, slumping oil prices, and the absence of the expansion rights sold in 2009."[327] In other words, the facts in *Brinckerhoff* allowed the Court to look at price for a similar asset, albeit at a different time, to gauge if the terms were "no less favorable to the

---

[325] *Id.* at 8 (citing *Brinckerhoff.*, 159 A.3d at 256).
[326] *Brinckerhoff*, 159 A.3d at 248.
[327] *Id.* at 257.

59

Partnership than those generally provided to or available from unrelated third parties."[328] The Court, in fact, found they were not.[329]

Here, by contrast, the Defendants have created a unique and complex security. It is a single transaction offered simultaneously to selected parties. There are no "generally" similar transactions to which to compare it. The terms of the Private Offering were not lifted from some market. It is true that ETE extended the Private Offering to a few outsiders, but that looks at the matter the wrong way 'round: the cost to ETE was not set by a market; ETE decided the terms, and then extended them to a few outsiders. This in no way insures that the costs to ETE were the same as those in arms-length transactions for similar securities; *there are none.*

ETE points out that the third-party institutional investors largely rejected the Private Offering, and thus proposes that the terms of the offering must be at—or below—market. I note that, for reasons poorly described in the record, but allegedly related to business interests of ETE, the security in the Private Offering is unregistered and not transferrable. These qualities make it less desirable to outsiders than to insiders. Moreover, the lack of liquidity is waivable at the discretion of the General Partner, cabined only by good faith. This is a boon to insiders, but cold comfort to independent parties considering the security. In fact, the testimony of

---

[328] JX 1.0032.
[329] *Brinckerhoff*, 159 A.3d at 257.

Kevin McCarthy, of Kayne Anderson, showed that Kayne declined to subscribe to the securities because they were not sufficiently valuable *given the lack of liquidity*.[330]

In this light, I find that ETE has not reached safe harbor, based on importing market terms to the conflicted transaction.

## 2. The Private Issuance Was Not Fair and Reasonable to ETE

Having found that the Defendants have not reached safe harbor, I must now turn to the factual question of whether the Defendants have met the burden placed on them to justify a conflicted transaction: that the transaction is objectively fair and reasonable to the Partnership. The contractual standard here—that insider transactions are prohibited unless "fair and reasonable"—invokes an analysis akin to the "entire fairness" review of corporate law;[331] my analysis must consider both fair process and fair price, unifying those considerations to reach a single result.[332] Based on the evidence at trial, I find that the Defendants have failed to show that the

---

[330] McCarthy Dep. 97:22–98:4.

[331] *Brinckerhoff*, 159 A.3d at 256–57 ("The fair and reasonable standard is something similar, if not equivalent to entire fairness review." (internal quotation marks and citation omitted)).

[332] *See, e.g.*, *Oliver v. Boston Univ.*, 2006 WL 1064169, at *18 (Del. Ch. Apr. 14, 2006) ("The entire fairness inquiry has two basic aspects: (1) fair dealing or fair process and (2) fair price. . . . Although evaluation of two components is necessary to determine entire fairness, 'the test for fairness is not a bifurcated one as between fair dealing and price; [instead, all] aspects of the issue must be examined as a whole since the question is one of entire fairness.'" (second alteration in original) (quoting *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983))).

Private Offering was entirely fair to the Partnership. I make the following findings of fact:

1) As of February 2016, ETE faced a delevering crisis. It had been warned, effectively, by the rating agencies that it must reduce its D/E or face a rating downgrade, which would have had catastrophic consequences for ETE.[333] The impending cash acquisition of Williams Co. made delevering imperative.[334]

2) The state of the energy industry, and provisions of the merger agreement with Williams Co., limited opportunities to delever via sale of assets or issuance of equity.[335]

3) ETE made quarterly distributions to unitholders. It could reduce its D/E by cancelling distributions and retaining cash.[336] Because distributions of earnings were the reason for being of the MLP, ETE was reluctant to cut distributions, and viewed such cuts as detrimental to the Partnership, and a last resort.[337]

4) ETE devised the public offering as a creative alternative to cancelling or cutting distributions. In effect, the public offering served as a kind of

---

[333] Trial Tr. 230:19–231:19, 233:3–20; JX 49.0002; JX 53.0001.
[334] JX 175.0004.
[335] *E.g.*, Beach Dep. 259:12–21; Trial Tr. 138:20–139:4, 251:1–252:8; JX 35, § 4.01(b).
[336] JX 136.0006, .0014; JX 175.0005, .0007.
[337] Trial Tr. 247:4–6, 391:24–392:13, 456:24–457:5.

voluntary distribution cut, or deferral, by subscribers. In the Initial Terms considered by the directors, subscribers would agree to forgo all but $0.11/unit of any distributions for the term, eight quarters.[338] ETE was then paying a distribution of $0.285.[339] If common units received no distribution, the subscribers would accrue an in-kind credit of $0.11, to be converted to units at the end of the term.[340] If ETE made a distribution of $0.11, subscribers received that cash as well.[341] If ETE made a distribution of greater than $0.11, subscribers would receive $0.11 cash and the balance in credits, which would convert to common units at the end of the term.[342] The conversion would be based on a 5% discount to market price for units, as it was at the beginning of the term.[343]

5) The $0.11 (cash or in kind) minimum distribution had two functions. First, it was an incentive to subscribe, because it formed a hedge against the possibility that distributions would be cancelled. I find that as of February 2017, cancellation of distributions was a possibility, but not a certainty, and that ETE hoped to avoid cancellation even if the Williams Co. merger

---

[338] JX 175.0012–13.
[339] PTO at 7.
[340] JX 175.0012–13.
[341] *Id.*
[342] *Id.*
[343] JX 219.0004.

went through.[344]  The $0.11 minimum also allowed accruals, at the then-customary rate, to be cash-neutral to subscribers.[345]

6) The 5% discount to market conversion price served as an incentive to subscribe.[346] It offered some upside if the market for units remained stable, and would become more valuable if that market improved.  5% was significantly less than the 10-15% discount recommended by ETE's financial advisor, Perella.[347]

7) The Initial Terms of the public offering would have provided significant benefits to ETE, even though, in light of the Williams Co. merger, it would not reduce D/E below 4.0, the goal set by the rating agencies.[348]  It had value in that it gave ETE time to achieve that ratio without cancellation of distributions, by taking other measures, including sale of assets, post merger.[349]  Perella, ETE's financial advisor, recommended these terms to

---

[344] *E.g.*, JX 280.0013.

[345] Trial Tr. 255:19–256:15, 411:7–413:2.

[346] It is worth pointing out, perhaps, the obvious: that the accrual rate and the conversion rate could have value to subscribers, under either the Public or Private Offerings, only if the subscription was not universal.  If all unit holders in ETE fully subscribed, accrued and converted credits would result in a pro rata increase in equity, effectively a wash.  Both public and Private Offerings, therefore, were designed to have less than full subscription, and the upcoming conversion will dilute to some extent the equity of non-subscribers to the benefit of subscribers.  The choice for potential subscribers was whether receiving a full cash distribution during the term of the Securities would offset this benefit to subscribers.

[347] Trial Tr. 257:3–7.

[348] *Id.* at 73:15–18.

[349] *E.g.*, *id.* at 415:6–12.

the Board.[350]  The Initial Terms of the public offering were fair to ETE, and it would have been objectively fair and reasonable to offer such securities to insiders, as required by Section 7.6(f) of the LPA.

8) Before the Board meeting of February 15, at which the public offering was to be considered, Long, ETE's CFO, had learned from his counterpart at Williams Co. that Williams Co.'s consent to the public offering was unlikely.[351]  Such consent was required, because ETE would not be able to file a Form S-3 without it, and the public offering could not be completed unless that form was filed.[352]  McReynolds, ETE's president, and Mason, ETE's general counsel, received emails on February 14 indicating that Williams Co.'s outside counsel believed Williams Co.'s consent was required to complete the public offering.[353]  Long informed the directors at the February 15 meeting, before the vote, of Williams Co.'s position.[354]

9) The public offering as approved by the Board on February 15 had additional terms not included in the Initial Terms.  Under the Initial Terms, a subscriber would agree to forgo any distribution above $0.11, with the difference accruing as credit toward common units, convertible at the end

[350] JX 175.0003, .0008.
[351] Trial Tr. 315:12–316:11.
[352] 17 C.F.R. § 210.3–05.
[353] JX 209.0001
[354] Trial Tr. 315:12–316:11.

of the term. The Revised Terms set an accrual as the difference between the $0.11 the subscriber received and the then-current distribution rate of $0.285, *regardless of whether any distribution to common unitholders was actually made*.[355] This eliminated downside risk: If distributions were eliminated, subscribers would receive a quarterly accrual of $0.285.[356] This term was eventually embodied in the Private Offering.[357]

10) The Defendants, who bear the burden of proof, were unable to explain how this additional downside hedge originated or came to be placed before the Board.[358] A reasonable supposition, which I adopt, was that Long informed insiders that a public offering to all unitholders would be unlikely, given Williams Co.'s lack of consent; that a Private Offering would be an alternative; that a substantial risk of distribution cuts or cancellations loomed; and that the insiders seized the opportunity to eliminate downside risk for themselves and their cronies.

11) The Board was presented with the new $0.285 accrual term for the first time at the February 15 meeting.[359] Perella personnel attended the meeting,[360] but the record is silent as to how, if at all, the financial advisor

---

[355] JX 219.0004.
[356] JX 216.0001.
[357] *Compare* JX 219.0003–04, *with* JX 410.0001–02.
[358] *E.g.*, Trial Tr. 322:12–18.
[359] JX 219.0019–20
[360] JX 213.0001.

explained this change to the Board. Subsequently, internal emails indicate that Perrella recognized that in case of a suspension of distributions, the new accrual term would represent a substantial transfer of wealth to subscribers.[361] Nothing in the record indicates that the directors found the new accrual term fair and reasonable, or (despite the internal Perella email) considered its consequences should distributions be cut. Nothing indicates that they determined that the term was necessary to the success of the public offering. In other words, the imposition of the new accrual term was not fair in terms of process, and nothing in the Board's actions indicates that it was fair as to price.

12) For reasons I have already explained in reference to the Conflicts Committee safe harbor, nothing in the examination of the Private Offering improves the process with respect to the $0.285 accrual term. Nothing in the testimony of Williams or the other directors, and nothing in the documentation concerning the Conflicts Committee or the February 28 board meeting adopting the Private Offering, demonstrates that the Defendants made a determination as to the reasonableness of the accrual term, and the process in that regard was not fair.

---

[361] JX 217.0002.

13) Fairness of price, in this context, requires examination of the exigencies faced by ETE that made the security, with its waiver of distributions in return for deferred issuance of equity, attractive; together with the risk that suspension of distributions to common unitholders would nonetheless be required, and the effect that would have on the price ultimately paid in units. I have determined, and the Plaintiffs do not seriously contest,[362] that the Initial Terms for the public offering were fair. Those terms were $0.11 guaranteed accrual if distributions were not made, deferral of all distributions above $0.11, in return for $0.11 in cash and accrual of the difference in credits against conversion for eight quarters, and 5% discount to current market price upon conversion. The Private Offering, by contrast, included the $0.285 accrual term, which would be substantially more valuable than the initial term to subscribers in case distributions were cancelled, and would in that case be substantially more expensive to the Partnership. Some upside was still preserved; the distributions to participating unitholders were capped at $0.285, unless the General Partner

---

[362] Unsurprisingly, the Plaintiffs do argue that the public offering, even at its Initial Terms, was unfair in light of what they argue Defendants knew was an "inevitable" distribution cut. I have already rejected that proposition, which is unsupported by the trial record. In any event, the Plaintiffs' own expert opined that the Public Placement would have been inherently fair and reasonable. Trial Tr. 58:4–7. I note also that the Board considered the opinion of its financial advisor, Perella, which opined that under the Initial Terms of the public offering, ETE would save "almost $1.0 billion of cash for debt reduction, if a high percentage of holders participate in the plan." JX 175.0003.

declared them "Extraordinary," in the General Partner's discretion.[363] The record simply does not exist to support the $0.285 accrual term as fair.

Given those facts, I cannot find that the Private Offering was fair. The burden is on the Defendants to demonstrate that the price of the securities to ETE, under the facts as then were known, was fair. The Defendants have failed to meet this burden; therefore, I conclude that the conflicted transaction was not fair and reasonable to the Partnership. The securities, to the extent they were transferred to the General Partner or its affiliates, breached the LPA, and I find that the Defendant Directors caused the General Partner to breach the LPA by issuing these securities.

*C. Remedy*

As a remedy for breach of the MLP, the Plaintiffs seek only equitable relief; cancellation of the securities. I find that relief not warranted, for reasons that follow.

Let me recapitulate what I have found above. As of February 2016, ETE, because of its business model and the downturn in the energy market, and in light of a pending merger agreement with Williams Co., had an urgent need to delever. It was constrained, by the Williams Co. merger agreement and the market, from selling assets or issuing substantial amounts of equity to ease debt. It was paying quarterly distributions, consistent with its business model, of $0.285/quarter/unit. Cutting or

---

[363] JX 219.0007.

suspending distributions was an obvious way to delever, but one that was particularly unattractive for an MLP.

As an alternative, the Board considered offering a security to all unitholders, in return for which they agreed to forgo some distributions. Instead, they would accrue credit redeemable for ETE units in the future. This alternative was, I find, acceptable, as an interim measure, to the rating agencies whose indirect threat to cut ETE's credit rating precipitated the crisis. Williams Co., pursuant to the merger agreement, had the power to veto this proposed public offering, and did so. The Board then considered, and approved, the Private Offering, which did not require approval by Williams Co. That transaction was, in part, extended to affiliates of the General Partner, and as such was required to be fair and reasonable to the Partnership.

The Initial Terms of the public offering involved a conversion rate at a 5% discount to market, and an $0.11 guaranteed minimum accrual. The accrual served as both an amount to compensate subscribers for taxes, assuming distributions continued, and an incentive to invest as a hedge, in the event they did not. Subscribers, in any case, would have borne risks akin to non-subscribers, in that they were better off if the company did well and distributions continued or increased, and worse off if ETE did poorly and was forced to cut distributions. The benefit to ETE was clear; deferred payment of distributions to subscribers, paid with equity, allowed

ETE to conserve cash at a crucial time. As the plan was evaluated by Perella, it was fair to ETE, and even below market. Perella, for instance, advocated a conversion rate that was a discount to market of 10-15%.[364] If the draft Initial Terms of the public offering had been repeated in the Private Offering, I would find that the Defendants had met their burden to show that the transaction was fair and reasonable to ETE.

Contemporaneously with ETE learning that Williams Co. might withhold approval for the public offering, a new term was presented to the General Partner's board. I use the passive voice in the preceding sentence advisedly; the record does not demonstrate who first suggested the guaranteed $0.285 accrual. It is equally opaque as to why, if at all, such an accrual term was better from ETE's perspective than the original terms. Nothing indicates that the Board considered the new term's effects. Nothing indicates why the Board adopted it. The Defendants have failed to show fair process with respect to the guaranteed accrual.

The Defendants must also demonstrate fair price, as of the time of the offering. Price is a complex matter here; it involved the probability that the Williams Co. merger would (or would not) go through, the probability that distributions would (or would not) be cut, and the cost in securities to ETE two years hence, in light of an unknown future market price for units. Nonetheless, the cost to ETE of switching

---

[364] JX 219.0004; Trial Tr. 257:3–7.

from an \$0.11 to a \$0.285 accrual, in case distributions were cut, was massive. Again, the benefit of the switch to ETE, if any, is undocumented in the record.

The burden of showing fair price is on the Defendants. Based on the record, they cannot satisfy that burden. The \$0.285 accrual guarantee looks like a gift to the insiders who subscribed to the securities, a massive hedge against distribution cuts.

I have found that the Private Offering was a conflicted transaction that was not fair and reasonable, and that by extending it to affiliates, the Defendants breached the LPA; what then is the remedy? Initially, the Plaintiffs asked for a declaration that the securities were void, but that assertion was based on the contention that they represented a prohibited non-pro-rata distribution, a contention I have rejected.[365] I have found that the General Partner and its directors, exercising their power to issue securities in ETE, breached the LPA by engaging in an unfair transaction with affiliates. The Plaintiffs argue that the remedy for such a breach should be cancellation of the securities. Of course, the usual remedy for contract breach is damages.[366]

---

[365] The Plaintiffs also argue that because the Directors intended approval of the Private Offering to be contingent on the recommendation of a properly constituted Conflicts Committee, the failure to achieve that recommendation resulted in the transaction being void; and that ministerial changes to the establishing documents after board approval rendered them void. I have rejected these contentions separately, above. To the extent that the Plaintiffs argue that any breach regarding an issuance of securities necessarily renders such securities void, I reject that as unsupported by the LPA.

[366] *See, e.g., Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001) ("[T]he standard remedy for breach of contract is based upon the reasonable expectations of the parties *ex ante*.")

The Plaintiffs argue that damages here are unavailable. They point to the exculpation from damages in the LPA, which restricts damages to acts in bad faith, which they have not alleged. Moreover, they concede that damages to the Partnership are not demonstrable here. The breach, in that event, can justify only nominal damages.[367]

The Plaintiffs' own expert, by contrast, purported to show damages by pointing to an impending transfer of wealth from the Partnership and non-subscribers to the subscribers in the redemption of the credits.[368] He based his damage calculations on the difference between the current market value of common units subscribers will receive at conversion, less the cost to them of the forgone distributions.[369] The subscribers will indeed do well. That result, however, is unrelated to the term in the Private Offering that I have found unfair. That is, it does not arise from the $0.285 accrual hedge that the Defendants have failed to demonstrate was fair. That term had value to subscribers only in case of a (never made) distribution *cut*.

Instead, the conversion price arose in the Initial Terms; it is an artifact of the original term sheet from the aborted public offering, which I have found fair. It was

---

[367] *See Ravenswood Inv. Co. L.P. v. Estate of Winmill*, 2018 WL 1989469, at *3 (Del. Ch. Apr. 27, 2018) (discussing nominal damages).
[368] JX 676.0046–48; s*ee also supra* note 346.
[369] *Id.*

in the interests of ETE that the subscription rate be sufficient to permit substantial delevering. Subscribing to the security entailed risk and costs, however. For a subscriber to agree to forgo potential distributions required a sufficient return on the accrued credit. The Board was entitled to rely on its financial advisor to set a discount rate that would be sufficiently attractive to ensure participation. Perella recommended 10-15% under then-market conditions; nonetheless, the Board determined to offer only a 5% discount in the Public, and ultimately the Private, Offerings.[370] This discount was modest if ETE's unit price remained static for the term. If the price went up, the conversion rate was better for subscribers; if it fell, worse.

As it has turned out, the energy market has boomed, the Williams Co. merger failed, and ETE's unit price has more than doubled—common unitholders have benefited, and when they convert their credit into units at 5% below the February 2016 unit price,[371] subscribers will do extraordinarily well.[372] The Plaintiffs argue that the insiders must have known that, in early 2016, ETE's unit price was depressed, and was sure to bounce back. But they point to no knowledge held by the Defendants unavailable to the market, and smart market players such as Kayne,

---

[370] JX 219.0004; Trial Tr. 257:3–7.
[371] The Conversion Price is 95% of the five-day volume-weighted average closing price of ETE's common units at the time of the offering, or $6.56. JX 676.0047 n.96.
[372] The closing price for ETE's Common Units on October 31, 2017 was $17.65 per unit. *Id.*

Neuberger, and Tortoise declined to subscribe, or fully subscribe, despite what the Plaintiffs describe in hindsight as ETE's depressed price.[373]    Again, Perella recommended a substantially higher discount to market to the Board.  The return on investment, based on the fair Initial Terms of the public offering carried forward into the Private Offering, cannot be the measure of damages resulting from the unfair $0.285 accrual term, because the return on investment is unrelated to that accrual term.  The Plaintiffs have not contended otherwise in post-trial briefing.

Instead, the Plaintiffs ask me to employ equity to remedy the Defendants' breach by cancelling the securities and their redeemable credits.  They ask me to place the subscribers into the position they would have been absent subscription.  In other words, they ask me to cancel the accrued credit, and pay the subscribers the forgone distributions, with interest, instead.  This would save the Partnership from issuing equity, but would cost ETE something on the order of $500 million in cash.[374]

The road to injunctive relief is well worn.  I must find that a plaintiff has prevailed on the merits, legal relief is inadequate, and the equities balance in favor of relief.[375]  Here, the Initial Terms of the public offering were fair.   From ETE's

---

[373] McCarthy, for instance, testified that Kayne decided not to subscribe the Securities, because their low value compared to common units alone did not compensate investors for the lack of liquidity.  McCarthy Dep. 97:22–98:4.

[374] *E.g.*, Trial Tr. 728:16–19.

[375] *See, e.g.*, *Sierra Club v. DNREC*, 2006 WL 1716913, at *3 (Del. Ch. June 19, 2006) ("The elements for permanent injunctive relief are: (1) actual success on the merits; (2) irreparable harm will be suffered if injunctive relief is not granted; and (3) the harm that will result from a failure

point of view, the Initial Terms offered a way to delever if distributions continued, at a modest price to the Partnership if eliminating distributions nonetheless proved necessary. The Defendants, however, were unable to justify the inclusion of the additional term guaranteeing an accrual rate. By adding the $0.285 accrual term, the General Partner guaranteed a large transfer from ETE to subscribers *if distributions were cut.* The term was a large downside hedge for subscribers, without an apparent benefit to ETE, except in the unlikely event that distributions went up.[376]

The unlikely event came to pass. As it turned out, under the fixed accrual at $0.285, the subscribers did *worse* than they would have under the unlimited accrual of the Initial Terms. Under those terms, subscribers would have accrued credit based on the difference between the subscribers' maximum $0.11 cash distribution and the amount of actual cash distributions. Instead, the Private Offering fixed accrual as the difference between $0.11 cash paid and $0.285. The distribution rate on common units, post-transaction, has been at or above $0.285 each quarter. Adding the unfair term has caused the Partnership no damages, therefore; it has actually mildly reduced the cost to ETE.[377] The other changes between the Initial Terms of the public offering and those in the Private Offering were either beneficial at the time (increase

---

to enjoin the actions that threaten plaintiff outweighs the harm that will befall the defendant if an injunction is granted.").

[376] I note that, even if distributions went up, the General Partner could waive the cap on distributions to the participating unitholders based on the General Partner's determination of an "Extraordinary Distribution." Some upside could still be captured.

[377] JX 219.0004; Trial Tr. 257:3–7.

of the term from eight to nine quarters), or neutral to the Partnership (the waiver provision.)

Rescinding the issuance, therefore, is not required in equity. It would not be proportional to any loss occasioned by the breach—there is none. Moreover, employing equity to cancel the securities would cause equitable problems of its own. Some subscribers were outsiders, and some were friends and relatives who had no hand in the addition of the problematic accrual term. These individuals are not parties. They participated in the Private Offering and accepted the associated risk. They have forgone distributions for nine quarters. Rescission would deny them the benefit of their bargain. It is worth noting that while I have found that the Defendants have failed to meet their burden to show the fairness of the transaction, it was not so one-sided that all securities were subscribed; many were not.

To repeat, the unfair term added to the initial, fair terms was the $0.285 accrual term, which was unfair as a downside hedge. If ETE had failed to make distributions of at least $0.285/unit/quarter, I would not hesitate to employ equity to compel the Defendants, at least, to disgorge the benefits they received through their breach of contractual responsibilities. Moreover, the General Partner retained the discretion to declare dividends above $0.285 "Extraordinary," in which case subscribers would accrue additional credits. If the General Partner had done so, again, equitable action might be appropriate. I do not condone the way in which the

final terms of the Private Placement were arrived at, or the rather clumsy and misleading attempts to justify it through vindication of the Conflicts Committee process. If the problematic hedge had, in fact, worked a benefit on the Defendants, equity would act.

Here, however, there was no such benefit. The Plaintiffs have established a breach, but not shown that the breach caused damage to ETE. The equities, therefore, do not require pre-distribution injunctive relief here. The Plaintiffs seek only cancellation of the securities *in toto*, and associated injunctive relief, which I have rejected.[378]

## III. CONCLUSION

For the foregoing reasons, the Plaintiffs' request for rescission and associated injunctive relief is denied. The parties should confer and advise me what further issues, including class certification, nominal damages, and remaining requests for equitable relief, if any, remain. Once that happens, an appropriate order will issue.

---

[378] Given my consideration of the record, the various evidentiary motions outstanding are moot.